# HARPER ET AL. *v.* VIRGINIA DEPARTMENT OF TAXATION

No. 91–794.   Argued December 2, 1992—Decided June 18, 1993

THOMAS, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, SCALIA, and SOUTER, JJ., joined, and in Parts I and III of which WHITE and KENNEDY, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 102. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which WHITE, J., joined, *post*, p. 110. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 113.

*Michael J. Kator* argued the cause and filed the briefs for petitioners.

*Gail Starling Marshall* argued the cause for respondent. With her on the brief were *Mary Sue Terry*, Attorney General of Virginia, *Stephen D. Rosenthal*, Chief Deputy Attorney General, *Gregory E. Lucyk* and *N. Pendleton Rogers*, Senior Assistant Attorneys General, *Barbara H. Vann*, Assistant Attorney General, and *Peter W. Low*.*

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Arkansas by *Winston Bryant*, Attorney General of Arkansas, and *Joyce Kinkead;* for the State of Georgia by *Michael J. Bowers*, Attorney General of Georgia, and *Warren R. Calvert* and *Daniel M. Formby*, Senior Assistant Attorneys General; for the State of North Carolina et al. by *Lacy H. Thornburg*, Attorney General of North Carolina, *Edwin M. Speas, Jr.*, Senior Deputy Attorney General, *H. Jefferson Powell*, *Norma S. Harrell* and *Thomas F. Moffitt*, Special Deputy Attorneys General, *Marilyn R. Mudge*, Assistant Attorney General, *Grant Woods*, Attorney General of Arizona, *Rebecca White Berch*, and *Gail H. Boyd*, Assistant Attorney General; for the State of Utah et al. by *Paul Van Dam*, Attorney General of Utah, *Leon A. Dever*, Assistant Attorney General, *James H. Evans*, Attorney General of Alabama, *Charles E. Cole*, Attorney General of Alaska, *Tautai A. F. Fa'Alevao*, Attorney General of American Samoa, *Daniel E. Lungren*, Attorney General of California, *Richard Blumenthal*, Attorney General of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *John Payton*, Corporate Counsel of the District of Columbia, *Warren Price III*, Attorney General of Hawaii, *Larry EchoHawk*, Attorney General of Idaho, *Roland W. Burris*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Bonnie J. Campbell*, Attorney General of Iowa, *Chris Gorman*, Attorney General of Kentucky, *Michael*

JUSTICE THOMAS delivered the opinion of the Court.

In *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803 (1989), we held that a State violates the constitutional doctrine of intergovernmental tax immunity when it taxes retirement benefits paid by the Federal Government but exempts from taxation all retirement benefits paid by the State or its political subdivisions. Relying on the retroactivity analysis of *Chevron Oil Co.* v. *Huson,* 404 U. S. 97 (1971), the Supreme Court of Virginia twice refused to apply *Davis* to

*E. Carpenter,* Attorney General of Maine, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Scott Harshbarger,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Michael C. Moore,* Attorney General of Mississippi, *Marc Racicot,* Attorney General of Montana, *Don Stenberg,* Attorney General of Nebraska, *Frankie Sue Del Papa,* Attorney General of Nevada, *John P. Arnold,* Attorney General of New Hampshire, *Robert J. Del Tufo,* Attorney General of New Jersey, *Tom Udall,* Attorney General of New Mexico, *Robert Abrams,* Attorney General of New York, *Lee Fisher,* Attorney General of Ohio, *Susan B. Loving,* Attorney General of Oklahoma, *Charles S. Crookham,* Attorney General of Oregon, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Jorge Perez-Diaz,* Attorney General of Puerto Rico, *James E. O'Neil,* Attorney General of Rhode Island, *A. Crawford Clarkson, Jr., Mark Barnett,* Attorney General of South Dakota, *Charles W. Burson,* Attorney General of Tennessee, *Dan Morales,* Attorney General of Texas, *Jeffrey L. Amestoy,* Attorney General of Vermont, *Rosalie Simmonds Ballentine,* Attorney General of the Virgin Islands, *Kenneth O. Eikenberry,* Attorney General of Washington, *Mario J. Palumbo,* Attorney General of West Virginia, *Joseph B. Meyer,* Attorney General of Wyoming, and *James E. Doyle, Jr.,* Attorney General of Wisconsin; for the city of New York by *O. Peter Sherwood, Edward F. X. Hart,* and *Stanley Buchsbaum;* and for the National Governors' Association et al. by *Richard Ruda* and *Charles Rothfeld.*

Briefs of *amici curiae* were filed for Designated Federal Retirees in Kansas et al. by *John C. Frieden, Kevin M. Fowler, Kenton C. Granger, Roger M. Theis, Carrold E. Ray, G. Eugene Boyce, Donald L. Smith, Edmund F. Sheehy, Jr., Brian A. Luscher, Gene M. Connell, Jr.,* and *J. Doyle Fuller;* for James B. Beam Distilling Co. by *Morton Siegel, Michael A. Moses, Richard G. Schoenstadt, James L. Webster,* and *John L. Taylor, Jr.;* for the Military Coalition by *Eugene O. Duffy;* and for the Virginia Manufacturers Association by *Walter A. Smith, Jr.*

taxes imposed before *Davis* was decided. In accord with *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), and *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529 (1991), we hold that this Court's application of a rule of federal law to the parties before the Court requires every court to give retroactive effect to that decision. We therefore reverse.

## I

The Michigan tax scheme at issue in *Davis* "exempt[ed] from taxation all retirement benefits paid by the State or its political subdivisions, but levie[d] an income tax on retirement benefits paid by . . . the Federal Government." 489 U. S., at 805. We held that the United States had not consented under 4 U. S. C. § 111[1] to this discriminatory imposition of a heavier tax burden on federal benefits than on state and local benefits. 489 U. S., at 808–817. Because Michigan "conceded that a refund [was] appropriate," we recognized that federal retirees were entitled to a refund of taxes "paid . . . pursuant to this invalid tax scheme." *Id.*, at 817.[2]

Like Michigan, Virginia exempted state and local employees' retirement benefits from state income taxation while taxing federal retirement benefits. Va. Code Ann. § 58.1–322(c)(3) (Supp. 1988). In response to *Davis*, Virginia repealed its exemption for state and local government employees. 1989 Va. Acts, Special Sess. II, ch. 3. It also enacted a special statute of limitations for refund claims made in light of *Davis*. Under this statute, taxpayers may seek a refund

---

[1] "The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States . . . by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation." 4 U. S. C. § 111.

[2] We have since followed *Davis* and held that a State violates intergovernmental tax immunity and 4 U. S. C. § 111 when it "taxes the benefits received from the United States by military retirees but does not tax the benefits received by retired state and local government employees." *Barker* v. *Kansas*, 503 U. S. 594, 596 (1992).

of state taxes imposed on federal retirement benefits in 1985, 1986, 1987, and 1988 for up to one year from the date of the final judicial resolution of whether Virginia must refund these taxes.   Va. Code Ann. § 58.1–1823(b) (Supp. 1992).[3]

Petitioners, 421 federal civil service and military retirees, sought a refund of taxes "erroneously or improperly assessed" in violation of *Davis'* nondiscrimination principle. Va. Code Ann. § 58.1–1826 (1991).   The trial court denied relief.   Law No. CL891080 (Va. Cir. Ct., Mar. 12, 1990). Applying the factors set forth in *Chevron Oil Co.* v. *Huson, supra,* at 106–107,[4] the court reasoned that "*Davis* decided an issue of first impression whose resolution was not clearly foreshadowed," that "prospective application of *Davis* will not retard its operation," and that "retroactive application would result in inequity, injustice and hardship."   App. to Pet. for Cert. 20a.

The Supreme Court of Virginia affirmed.   *Harper* v. *Virginia Dept. of Taxation,* 241 Va. 232, 401 S. E. 2d 868 (1991). It too concluded, after consulting *Chevron* and the plurality opinion in *American Trucking Assns., Inc.* v. *Smith,* 496 U. S. 167 (1990), that "the *Davis* decision is not to be applied retroactively."   241 Va., at 240, 401 S. E. 2d, at 873.   The court also rejected petitioners' contention that "refunds

---

[3] Applications for tax refunds generally must be made within three years of the assessment.   Va. Code Ann. § 58.1–1825 (1991).   As of the date we decided *Davis,* this statute of limitations would have barred all actions seeking refunds from taxes imposed before 1985.

[4] "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.   Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Finally, we have weighed the inequity imposed by retroactive application . . . ."   *Chevron Oil Co.* v. *Huson,* 404 U. S., at 106–107 (citations omitted).

[were] due as a matter of state law." *Ibid.* It concluded that "because the *Davis* decision is not to be applied retroactively, the pre-*Davis* assessments were neither erroneous nor improper" under Virginia's tax refund statute. *Id.*, at 241, 401 S. E. 2d, at 873. As a matter of Virginia law, the court held, a "ruling declaring a taxing scheme unconstitutional is to be applied prospectively only." *Ibid.* This rationale supplied "another reason" for refusing relief. *Ibid.*

Even as the Virginia courts were denying relief to petitioners, we were confronting a similar retroactivity problem in *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529 (1991). At issue was *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), which prohibited States from imposing higher excise taxes on imported alcoholic beverages than on local products. The Supreme Court of Georgia had used the analysis described in *Chevron Oil Co.* v. *Huson* to deny retroactive effect to a decision of this Court. Six Members of this Court disagreed, concluding instead that *Bacchus* must be applied retroactively to claims arising from facts predating that decision. *Beam*, 501 U. S., at 532 (opinion of SOUTER, J.); *id.*, at 544–545 (WHITE, J., concurring in judgment); *id.*, at 547–548 (BLACKMUN, J., concurring in judgment); *id.*, at 548–549 (SCALIA, J., concurring in judgment). After deciding *Beam*, we vacated the judgment in *Harper* and remanded for further consideration. 501 U. S. 1247 (1991).

On remand, the Supreme Court of Virginia again denied tax relief. 242 Va. 322, 410 S. E. 2d 629 (1991). It reasoned that because Michigan did not contest the *Davis* plaintiffs' entitlement to a refund, this Court "made no . . . ruling" regarding the retroactive application of its rule "to the litigants in that case." 242 Va., at 326, 410 S. E. 2d, at 631. Concluding that *Beam* did not foreclose application of *Chevron*'s retroactivity analysis because "the retroactivity issue was not decided in *Davis*," 242 Va., at 326, 410 S. E. 2d, at

631, the court "reaffirm[ed] [its] prior decision in all respects," *id.*, at 327, 410 S. E. 2d, at 632.

When we decided *Davis*, 23 States gave preferential tax treatment to benefits received by employees of state and local governments relative to the tax treatment of benefits received by federal employees.[5] Like the Supreme Court of Virginia, several other state courts have refused to accord full retroactive effect to *Davis* as a controlling statement of federal law.[6] Two of the courts refusing to apply *Davis* retroactively have done so after this Court remanded for reconsideration in light of *Beam.* See *Bass* v. *South Carolina*, 501 U. S. 1246 (1991); *Harper* v. *Virginia Dept. of Taxation*, 501 U. S. 1247 (1991); *Lewy* v. *Virginia Dept. of Taxation*, decided with *Harper* v. *Virginia Dept. of Taxation*, 501 U. S. 1247 (1991). By contrast, the Supreme Court of Arkansas has concluded as a matter of federal law that *Davis* applies retroactively. *Pledger* v. *Bosnick*, 306 Ark. 45, 54–56, 811 S. W. 2d 286, 292–293 (1991), cert. pending, No. 91–375. Cf. *Reich* v. *Collins*, 262 Ga. 625, 422 S. E. 2d 846 (1992)

---

[5] *E. g.*, Ala. Code § 36–27–28 (1991), Ala. Code § 40–18–19 (1985); Iowa Code § 97A.12 (1984), repealed, 1989 Iowa Acts, ch. 228, § 10 (repeal retroactive to Jan. 1, 1989); La. Rev. Stat. Ann. § 47:44.1 (West Supp. 1990); Miss. Code Ann. § 25–11–129 (1972); Mo. Rev. Stat. § 86.190 (1971), Mo. Rev. Stat. § 104.540 (1989); Mont. Code Ann. § 15–30–111(2) (1987); N. Y. Tax Law § 612(c)(3) (McKinney 1987); Utah Code Ann. § 49–1–608 (1989). See generally *Harper* v. *Virginia Dept. of Taxation*, 241 Va. 232, 237, n. 2, 401 S. E. 2d 868, 871, n. 2 (1991).

[6] *Bohn* v. *Waddell*, 167 Ariz. 344, 349, 807 P. 2d 1, 6 (Tax Ct. 1991); *Sheehy* v. *State*, 250 Mont. 437, 820 P. 2d 1257 (1991), cert. pending, No. 91–1473; *Duffy* v. *Wetzler*, 174 App. Div. 2d 253, 265, 579 N. Y. S. 2d 684, 691, appeal denied, 80 N. Y. 2d 890, 600 N. E. 2d 627 (1992), cert. pending, No. 92–521; *Swanson* v. *State*, 329 N. C. 576, 581–584, 407 S. E. 2d 791, 793–795 (1991), aff'd on reh'g, 330 N. C. 390, 410 S. E. 2d 490 (1991), cert. pending, No. 91–1436; *Ragsdale* v. *Department of Revenue*, 11 Ore. Tax 440 (1990), aff'd on other grounds, 312 Ore. 529, 823 P. 2d 971 (1992); *Bass* v. *State*, 307 S. C. 113, 121–122, 414 S. E. 2d 110, 114–115 (1992), cert. pending, No. 91–1697.

(holding that *Davis* applies retroactively but reasoning that state law precluded a refund), cert. pending, Nos. 92–1276 and 92–1453.[7]

After the Supreme Court of Virginia reaffirmed its original decision, we granted certiorari a second time. 504 U. S. 907 (1992). We now reverse.

## II

"[B]oth the common law and our own decisions" have "recognized a general rule of retrospective effect for the constitutional decisions of this Court." *Robinson* v. *Neil,* 409 U. S. 505, 507 (1973). Nothing in the Constitution alters the fundamental rule of "retrospective operation" that has governed "[j]udicial decisions . . . for near a thousand years." *Kuhn* v. *Fairmont Coal Co.,* 215 U. S. 349, 372 (1910) (Holmes, J., dissenting). In *Linkletter* v. *Walker,* 381 U. S. 618 (1965), however, we developed a doctrine under which we could deny retroactive effect to a newly announced rule of criminal law. Under *Linkletter,* a decision to confine a new rule to prospective application rested on the purpose of the new rule, the reliance placed upon the previous view of the law, and "the effect on the administration of justice of a retrospective application" of the new rule. *Id.,* at 636 (limiting *Mapp* v. *Ohio,* 367 U. S. 643 (1961)).[8] In the civil context, we similarly permitted the denial of retroactive effect to "a new principle of law" if such a limitation would avoid " 'injustice or hardship' " without unduly undermining the "purpose

---

[7] Several other state courts have ordered refunds as a matter of state law in claims based on *Davis.* See, *e. g., Kuhn* v. *State,* 817 P. 2d 101, 109–110 (Colo. 1991); *Hackman* v. *Director of Revenue,* 771 S. W. 2d 77, 80–81 (Mo. 1989), cert. denied, 493 U. S. 1019 (1990).

[8] Accord, *e. g., Tehan* v. *United States ex rel. Shott,* 382 U. S. 406 (1966) (limiting *Griffin* v. *California,* 380 U. S. 609 (1965)); *Johnson* v. *New Jersey,* 384 U. S. 719 (1966) (limiting *Escobedo* v. *Illinois,* 378 U. S. 478 (1964), and *Miranda* v. *Arizona,* 384 U. S. 436 (1966)); *Stovall* v. *Denno,* 388 U. S. 293 (1967) (limiting *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v. *California,* 388 U. S. 263 (1967)).

and effect" of the new rule. *Chevron Oil Co.* v. *Huson*, 404 U. S., at 106–107 (quoting *Cipriano* v. *City of Houma*, 395 U. S. 701, 706 (1969)).[9]

We subsequently overruled *Linkletter* in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), and eliminated limits on retroactivity in the criminal context by holding that all "newly declared . . . rule[s]" must be applied retroactively to all "criminal cases pending on direct review." *Id.*, at 322. This holding rested on two "basic norms of constitutional adjudication." *Ibid.* First, we reasoned that "the nature of judicial review" strips us of the quintessentially "legislat[ive]" prerogative to make rules of law retroactive or prospective as we see fit. *Ibid.* Second, we concluded that "selective application of new rules violates the principle of treating similarly situated [parties] the same." *Id.*, at 323.

Dicta in *Griffith*, however, stated that "civil retroactivity . . . . continue[d] to be governed by the standard announced in *Chevron Oil.*" *Id.*, at 322, n. 8. We divided over the meaning of this dicta in *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167 (1990). The four Justices in the plurality used "the *Chevron Oil* test" to consider whether to confine "the application of [*American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987),] to taxation of highway use prior to June 23, 1987, the date we decided *Scheiner.*" *Id.*,

---

[9] We need not debate whether *Chevron Oil* represents a true "choice-of-law principle" or merely "a remedial principle for the exercise of equitable discretion by federal courts." *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 220 (1990) (STEVENS, J., dissenting). Compare *id.*, at 191–197 (plurality opinion) (treating *Chevron Oil* as a choice-of-law rule), with *id.*, at 218–224 (STEVENS, J., dissenting) (treating *Chevron Oil* as a remedial doctrine). Regardless of how *Chevron Oil* is characterized, our decision today makes it clear that "the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case" and that the federal law applicable to a particular case does not turn on "whether [litigants] actually relied on [an] old rule [or] how they would suffer from retroactive application" of a new one. *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529, 543 (1991) (opinion of SOUTER, J.).

at 179 (opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and WHITE and KENNEDY, JJ.). Four other Justices rejected the plurality's "anomalous approach" to retroactivity and declined to hold that "the law applicable to a particular case is that law which the parties believe in good faith to be applicable to the case." *Id.*, at 219 (STEVENS, J., dissenting, joined by Brennan, Marshall, and BLACKMUN, JJ.). Finally, despite concurring in the judgment, JUSTICE SCALIA "share[d]" the dissent's "perception that prospective decisionmaking is incompatible with the judicial role." *Id.*, at 201.

*Griffith* and *American Trucking* thus left unresolved the precise extent to which the presumptively retroactive effect of this Court's decisions may be altered in civil cases. But we have since adopted a rule requiring the retroactive application of a civil decision such as *Davis.* Although *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529 (1991), did not produce a unified opinion for the Court, a majority of Justices agreed that a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law. In announcing the judgment of the Court, JUSTICE SOUTER laid down a rule for determining the retroactive effect of a civil decision: After the case announcing any rule of federal law has "appl[ied] that rule with respect to the litigants" before the court, no court may "refuse to apply [that] rule . . . retroactively." *Id.*, at 540 (opinion of SOUTER, J., joined by STEVENS, J.). JUSTICE SOUTER's view of retroactivity superseded "any claim based on a *Chevron Oil* analysis." *Ibid.* JUSTICE WHITE likewise concluded that a decision "extending the benefit of the judgment" to the winning party "is to be applied to other litigants whose cases were not final at the time of the [first] decision." *Id.*, at 544 (opinion concurring in judgment). Three other Justices agreed that "our judicial responsibility . . . requir[es] retroactive application of each . . . rule we announce." *Id.*, at 548 (BLACKMUN, J.,

joined by Marshall and SCALIA, JJ., concurring in judgment). See also *id.*, at 548–549 (SCALIA, J., joined by Marshall and BLACKMUN, JJ., concurring in judgment).

*Beam* controls this case, and we accordingly adopt a rule that fairly reflects the position of a majority of Justices in *Beam:* When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. This rule extends *Griffith*'s ban against "selective application of new rules." 479 U. S., at 323. Mindful of the "basic norms of constitutional adjudication" that animated our view of retroactivity in the criminal context, *id.*, at 322, we now prohibit the erection of selective temporal barriers to the application of federal law in noncriminal cases. In both civil and criminal cases, we can scarcely permit "the substantive law [to] shift and spring" according to "the particular equities of [individual parties'] claims" of actual reliance on an old rule and of harm from a retroactive application of the new rule. *Beam, supra,* at 543 (opinion of SOUTER, J.). Our approach to retroactivity heeds the admonition that "[t]he Court has no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently." *American Trucking, supra,* at 214 (STEVENS, J., dissenting).

The Supreme Court of Virginia "appl[ied] the three-pronged *Chevron Oil* test in deciding the retroactivity issue" presented by this litigation. 242 Va., at 326, 410 S. E. 2d, at 631. When this Court does not "reserve the question whether its holding should be applied to the parties before it," however, an opinion announcing a rule of federal law "is properly understood to have followed the normal rule of retroactive application" and must be "read to hold . . . that its rule should apply retroactively to the litigants then before

the Court." *Beam,* 501 U. S., at 539 (opinion of SOUTER, J.). Accord, *id.,* at 544–545 (WHITE, J., concurring in judgment); *id.,* at 550 (O'CONNOR, J., dissenting). Furthermore, the legal imperative "to apply a rule of federal law retroactively after the case announcing the rule has already done so" must "prevai[l] over any claim based on a *Chevron Oil* analysis." *Id.,* at 540 (opinion of SOUTER, J.).

In an effort to distinguish *Davis,* the Supreme Court of Virginia surmised that this Court had "made no . . . ruling" about the application of the rule announced in *Davis* "retroactively to the litigants in that case." 242 Va., at 326, 410 S. E. 2d, at 631. "[B]ecause the retroactivity issue was not decided in *Davis,*" the court believed that it was "not foreclosed by precedent from applying the three-pronged *Chevron Oil* test in deciding the retroactivity issue in the present case." *Ibid.*

We disagree. *Davis* did not hold that preferential state tax treatment of state and local employee pensions, though constitutionally invalid in the future, should be upheld as to all events predating the announcement of *Davis.* The governmental appellee in *Davis* "conceded that a refund [would have been] appropriate" if we were to conclude that "the Michigan Income Tax Act violate[d] principles of intergovernmental tax immunity by favoring retired state and local governmental employees over retired federal employees." 489 U. S., at 817. We stated that "to the extent appellant has paid taxes pursuant to this invalid tax scheme, he is entitled to a refund." *Ibid.* Far from reserving the retroactivity question, our response to the appellee's concession constituted a retroactive application of the rule announced in *Davis* to the parties before the Court. Because a decision to accord solely prospective effect to *Davis* would have foreclosed any discussion of remedial issues, our "consideration of remedial issues" meant "necessarily" that we retroactively applied the rule we announced in *Davis* to the litigants before us. *Beam, supra,* at 539 (opinion of SOUTER, J.).

Therefore, under *Griffith, Beam,* and the retroactivity approach we adopt today, the Supreme Court of Virginia must apply *Davis* in petitioners' refund action.

## III

Respondent Virginia Department of Taxation defends the judgment below as resting on an independent and adequate state ground that relieved the Supreme Court of Virginia of any obligation to apply *Davis* to events occurring before our announcement of that decision. Petitioners had contended that "even if the *Davis* decision applie[d] prospectively only," they were entitled to relief under Virginia's tax refund statute, Va. Code Ann. § 58.1–1826 (1991). *Harper* v. *Virginia Dept. of Taxation,* 241 Va., at 241, 401 S. E. 2d, at 873. The Virginia court rejected their argument. It first reasoned that because *Davis* did not apply retroactively, tax assessments predating *Davis* were "neither erroneous nor improper within the meaning" of Virginia's tax statute. *Ibid.* The court then offered "another reason" for rejecting petitioners' "state-law contention": "We previously have held that this Court's ruling declaring a taxing scheme unconstitutional is to be applied prospectively only." *Ibid.* (citing *Perkins* v. *Albemarle County,* 214 Va. 240, 198 S. E. 2d 626, aff'd and modified on rehearing, 214 Va. 416, 200 S. E. 2d 566 (1973); *Capehart* v. *City of Chesapeake,* No. 5459 (Va. Cir. Ct., Oct. 16, 1974), appeal denied, 215 Va. xlvii, cert. denied, 423 U. S. 875 (1975)). The formulation of this state-law retroactivity doctrine—that "consideration should be given to the purpose of the new rule, the extent of the reliance on the old rule, and the effect on the administration of justice of a retroactive application of the new rule," *Fountain* v. *Fountain,* 214 Va. 347, 348, 200 S. E. 2d 513, 514 (1973), cert. denied, 416 U. S. 939 (1974), quoted in 241 Va., at 241, 401 S. E. 2d, at 874—suggests that the Supreme Court of Virginia has simply incorporated into state law the three-pronged analysis of *Chevron Oil,* 404 U. S., at 106–107, and

the criminal retroactivity cases overruled by *Griffith,* see, *e. g., Stovall* v. *Denno,* 388 U. S. 293, 297 (1967).

We reject the department's defense of the decision below. The Supremacy Clause, U. S. Const., Art. VI, cl. 2, does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law. Whatever freedom state courts may enjoy to limit the retroactive operation of their own interpretations of state law, see *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 U. S. 358, 364–366 (1932), cannot extend to their interpretations of federal law. See *National Mines Corp.* v. *Caryl,* 497 U. S. 922, 923 (1990) *(per curiam); Ashland Oil, Inc.* v. *Caryl,* 497 U. S. 916, 917 (1990) *(per curiam).*

We also decline the Department of Taxation's invitation to affirm the judgment as resting on the independent and adequate ground that Virginia's law of remedies offered no "retrospective refund remedy for taxable years concluded before *Davis*" was announced. Brief for Respondent 33. The Virginia Supreme Court's conclusion that the challenged tax assessments were "neither erroneous nor improper within the meaning" of the refund statute rested solely on the court's determination that *Davis* did not apply retroactively. *Harper* v. *Virginia Dept. of Taxation, supra,* at 241, 401 S. E. 2d, at 873.

Because we have decided that *Davis* applies retroactively to the tax years at issue in petitioners' refund action, we reverse the judgment below. We do not enter judgment for petitioners, however, because federal law does not necessarily entitle them to a refund. Rather, the Constitution requires Virginia "to provide relief consistent with federal due process principles." *American Trucking,* 496 U. S., at 181 (plurality opinion). Under the Due Process Clause, U. S. Const., Amdt. 14, § 1, "a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination." *McKesson Corp.* v. *Division of*

*Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U. S. 18, 39–40 (1990). If Virginia "offers a meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing," the "availability of a predeprivation hearing constitutes a procedural safeguard . . . sufficient by itself to satisfy the Due Process Clause." *Id.,* at 38, n. 21. On the other hand, if no such predeprivation remedy exists, "the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation." *Id.,* at 31 (footnotes omitted).[10] In providing such relief, a State may either award full refunds to those burdened by an unlawful tax or issue some other order that "create[s] in hindsight a nondiscriminatory scheme." *Id.,* at 40. Cf. *Davis,* 489 U. S., at 818 (suggesting that a State's failure to respect intergovernmental tax immunity could be cured "either by extending [a discriminatory] tax exemption to retired federal employees . . . or by eliminating the exemption for retired state and local government employees").

The constitutional sufficiency of any remedy thus turns (at least initially) on whether Virginia law "provide[s] a[n] [adequate] form of 'predeprivation process,' for example, by authorizing taxpayers to bring suit to enjoin imposition of a tax

---

[10] A State incurs this obligation when it "places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality." *McKesson,* 496 U. S., at 31. A State that "establish[es] various sanctions and summary remedies designed" to prompt taxpayers to "tender . . . payments *before* their objections are entertained and resolved" does not provide taxpayers "a meaningful opportunity to withhold payment and to obtain a predeprivation determination of the tax assessment's validity." *Id.,* at 38 (emphasis in original). Such limitations impose constitutionally significant " 'duress' " because a tax payment rendered under these circumstances must be treated as an effort "to avoid financial sanctions or a seizure of real or personal property." *Id.,* at 38, n. 21. The State accordingly may not confine a taxpayer under duress to prospective relief.

prior to its payment, or by allowing taxpayers to withhold payment and then interpose their objections as defenses in a tax enforcement proceeding." *McKesson*, 496 U. S., at 36–37.   Because this issue has not been properly presented, we leave to Virginia courts this question of state law and the performance of other tasks pertaining to the crafting of any appropriate remedy.   Virginia "is free to choose which form of relief it will provide, so long as that relief satisfies the minimum federal requirements we have outlined." *Id.*, at 51–52.   State law may provide relief beyond the demands of federal due process, *id.*, at 52, n. 36, but under no circumstances may it confine petitioners to a lesser remedy, see *id.*, at 44–51.

## IV

We reverse the judgment of the Supreme Court of Virginia, and we remand the case for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE SCALIA, concurring.

I am surprised to see an appeal to *stare decisis* in today's dissent.   In *Teague* v. *Lane*, 489 U. S. 288 (1989), JUSTICE O'CONNOR wrote for a plurality that openly rejected settled precedent controlling the scope of retroactivity on collateral review.   "This retroactivity determination," the opinion said, "would normally entail application of the *Linkletter* [v. *Walker*, 381 U. S. 618 (1965),] standard, but we believe that our approach to retroactivity for cases on collateral review requires modification." *Id.*, at 301.   The dissent in *Teague* was a sort of anticipatory echo of today's dissent, criticizing the plurality for displaying "infidelity to the doctrine of *stare decisis*," *id.*, at 331 (Brennan, J., dissenting), for "upset[ting] . . . our time-honored precedents," *id.*, at 333, for "repudiating our familiar approach without regard for the doctrine of *stare decisis*," *id.*, at 345, and for failing "so much as [to] mention *stare decisis*," *id.*, at 333.

I joined the plurality opinion in *Teague*. Not only did I believe the rule it announced was correct, see *Withrow* v. *Williams*, 507 U. S. 680, 717 (1993) (SCALIA, J., concurring in part and dissenting in part), but I also believed that abandonment of our prior collateral-review retroactivity rule was fully in accord with the doctrine of *stare decisis*, which as applied by our Court has never been inflexible. The *Teague* plurality opinion set forth good reasons for abandoning *Linkletter*—reasons justifying a similar abandonment of *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971). It noted, for example, that *Linkletter* "ha[d] not led to consistent results," *Teague*, *supra*, at 302; but neither has *Chevron Oil*. Proof that what it means is in the eye of the beholder is provided quite nicely by the separate opinions filed today: Of the four Justices who would still apply *Chevron Oil*, two find *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989), retroactive, see *post*, at 111 (KENNEDY, J., concurring in part and concurring in judgment), two find it not retroactive, see *post*, at 122 (O'CONNOR, J., dissenting). Second, the *Teague* plurality opinion noted that *Linkletter* had been criticized by commentators, *Teague*, *supra*, at 303; but the commentary cited in the opinion criticized not just *Linkletter*, but the Court's retroactivity jurisprudence in general, of which it considered *Chevron Oil* an integral part, see Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va. L. Rev. 1557, 1558, 1581–1582, 1606 (1975). Other commentary, of course, has also regarded the issue of retroactivity as a general problem of jurisprudence. See, *e. g.*, Fallon & Meltzer, New Law, Non-Retroactivity, and Constitutional Remedies, 104 Harv. L. Rev. 1731 (1991); Schaefer, Prospective Rulings: Two Perspectives, 1982 S. Ct. Rev. 1; Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N. Y. U. L. Rev. 631 (1967); Mishkin, Forward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 58–72 (1965).

Finally, the plurality opinion in *Teague* justified the departure from *Linkletter* by implicitly relying on the well-settled proposition that *stare decisis* has less force where intervening decisions "have removed or weakened the conceptual underpinnings from the prior decision." *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 173 (1989). JUSTICE O'CONNOR endorsed the reasoning expressed by Justice Harlan in his separate opinions in *Mackey* v. *United States,* 401 U. S. 667 (1971), and *Desist* v. *United States,* 394 U. S. 244 (1969), and noted that the Court had already adopted the first part of Justice Harlan's retroactivity views in *Griffith* v. *Kentucky,* 479 U. S. 314 (1987). See *Teague, supra,* at 303–305. Again, this argument equally—indeed, even more forcefully—supports reconsideration of *Chevron Oil. Griffith* returned this Court, in criminal cases, to the traditional view (which I shall discuss at greater length below) that prospective decisionmaking "violates basic norms of constitutional adjudication." *Griffith, supra,* at 322. One of the conceptual underpinnings of *Chevron Oil* was that retroactivity presents a *similar* problem in both civil and criminal contexts. See *Chevron Oil, supra,* at 106; see also Beytagh, *supra,* at 1606. Thus, after *Griffith, Chevron Oil* can be adhered to *only by rejecting the reasoning of Chevron Oil*— that is, only by asserting that the issue of retroactivity is *different* in the civil and criminal settings. That is a particularly difficult proof to make, inasmuch as *Griffith* rested on "basic norms of constitutional adjudication" and "the nature of judicial review." 479 U. S., at 322; see also *Teague, supra,* at 317 (WHITE, J., concurring in part and concurring in judgment) (*Griffith* "appear[s] to have constitutional underpinnings").[1]

---

[1] The dissent attempts to distinguish between retroactivity in civil and criminal settings on three grounds, none of which has ever been adopted by this Court. The dissent's first argument begins with the observation that "nonretroactivity in criminal cases historically has favored the government's reliance interests over the rights of criminal defend-

What most provokes comment in the dissent, however, is not its insistence that today a rigid doctrine of *stare decisis* forbids tinkering with retroactivity, which four Terms ago did not; but rather the irony of its invoking *stare decisis* in defense of prospective decisionmaking *at all*. Prospective decisionmaking is the handmaid of judicial activism, and the born enemy of *stare decisis*. It was formulated in the heyday of legal realism and promoted as a "techniqu[e] of judicial lawmaking" in general, and more specifically as a means of making it easier to overrule prior precedent. B. Levy, Realist Jurisprudence and Prospective Overruling,

---

ants." *Post*, at 121. But while it is true that prospectivity was usually employed in the past (during the brief period when it was used in criminal cases) to favor the government, there is no basis for the implicit suggestion that it would usually favor the government in the future. That phenomenon was a consequence, not of the nature of the doctrine, cf. *James v. United States*, 366 U. S. 213 (1961), but of the historical "accident" that during the period prospectivity was in fashion legal rules favoring the government were more frequently overturned. But more fundamentally, to base a rule of full retroactivity in the criminal-law area upon what the dissent calls "the generalized policy of favoring individual rights over governmental prerogative," *post*, at 121, makes no more sense than to adopt, because of the same "generalized policy," a similarly gross rule that no decision favoring criminal defendants can ever be overruled. The law is more discerning than that. The dissent's next argument is based on the dubious empirical assumption that civil litigants, but not criminal defendants, will often receive some benefit from a prospective decision. That assumption does not hold even in this case: Prospective invalidation of Virginia's taxing scheme would afford petitioners the enormous future "benefit," *ibid.*, of knowing that others in the State are being taxed more. But empirical problems aside, the dissent does not explain why, if a receipt-of-some-benefit principle is important, we should use such an inaccurate proxy as the civil/criminal distinction, or how this newly discovered principle overcomes the "basic norms of constitutional adjudication" on which *Griffith* v. *Kentucky*, 479 U. S. 314, 322 (1987), rested. Finally, the dissent's "equal treatment" argument ably distinguishes between cases in which a prospectivity claim is properly raised, and those in which it is not. See *post*, at 122. But that does nothing to distinguish between civil and criminal cases; obviously, a party may procedurally default on a claim in either context.

109 U. Pa. L. Rev. 1 (1960). Thus, the dissent is saying, in effect, that *stare decisis* demands the preservation of methods of destroying *stare decisis* recently invented in violation of *stare decisis*.

Contrary to the dissent's assertion that *Chevron Oil* articulated "our traditional retroactivity analysis," *post*, at 113, the jurisprudence it reflects "came into being," as Justice Harlan observed, less than 30 years ago with *Linkletter* v. *Walker*, 381 U. S. 618 (1965). *Mackey, supra*, at 676. It is so unancient that one of the current Members of this Court was sitting when it was invented. The true *traditional* view is that prospective decisionmaking is quite incompatible with the judicial power, and that courts have no authority to engage in the practice. See *ante*, at 94; *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529, 534 (1991) (opinion of SOUTER, J.); *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 201 (1990) (SCALIA, J., concurring in judgment); *Desist, supra*, at 258–259 (Harlan, J., dissenting); *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 365 (1932). *Linkletter* itself recognized that "[a]t common law there was no authority for the proposition that judicial decisions made law only for the future." 381 U. S., at 622–623. And before *Linkletter*, the academic proponents of prospective judicial decisionmaking acknowledged that their proposal contradicted traditional practice. See, *e. g.*, Levy, *supra*, at 2, and n. 2; Carpenter, Court Decisions and the Common Law, 17 Colum. L. Rev. 593, 594 (1917). Indeed, the roots of the contrary tradition are so deep that Justice Holmes was prepared to hazard the guess that "[j]udicial decisions have had retrospective operation for near a thousand years." *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349, 372 (1910) (dissenting opinion).

JUSTICE O'CONNOR asserts that "'[w]hen the Court changes its mind, the law changes with it.'" *Post*, at 115 (quoting *Beam, supra*, at 550 (O'CONNOR, J., dissenting)). That concept is quite foreign to the American legal and con-

stitutional tradition.  It would have struck John Marshall as an extraordinary assertion of raw power.  The conception of the judicial role that he possessed, and that was shared by succeeding generations of American judges until very recent times, took it to be "the province and duty of the judicial department to say what the law *is*," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803) (emphasis added)—not what the law *shall be*.  That original and enduring American perception of the judicial role sprang not from the philosophy of Nietzsche but from the jurisprudence of Blackstone, which viewed retroactivity as an inherent characteristic of the judicial power, a power "not delegated to pronounce a new law, but to maintain and expound the old one."  1 W. Blackstone, Commentaries 69 (1765).  Even when a "former determination is most evidently contrary to reason . . . [or] contrary to the divine law," a judge overruling that decision would "not pretend to make a new law, but to vindicate the old one from misrepresentation."  *Id.*, at 69–70.  "For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was *bad law*, but that it was *not law*."  *Id.*, at 70 (emphases in original).  Fully retroactive decisionmaking was considered a principal distinction between the judicial and the legislative power: "[I]t is said that that which distinguishes a judicial from a legislative act is, that the one is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the regulation of all future cases."  T. Cooley, Constitutional Limitations *91.  The critics of the traditional rule of full retroactivity were well aware that it was grounded in what one of them contemptuously called "another fiction known as the Separation of powers." Kocourek, Retrospective Decisions and Stare Decisis and a Proposal, 17 A. B. A. J. 180, 181 (1931).

Prospective decisionmaking was known to foe and friend alike as a practical tool of judicial activism, born out of disre-

gard for *stare decisis*. In the eyes of its enemies, the doctrine "smack[ed] of the legislative process," Mishkin, 79 Harv. L. Rev., at 65, "encroach[ed] on the prerogatives of the legislative department of government," Von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv. L. Rev. 409, 428 (1924), removed "one of the great inherent restraints upon this Court's depart[ing] from the field of interpretation to enter that of lawmaking," *James* v. *United States*, 366 U. S. 213, 225 (1961) (Black, J., concurring in part and dissenting in part), caused the Court's behavior to become "assimilated to that of a legislature," Kurland, Toward a Political Supreme Court, 37 U. Chi. L. Rev. 19, 34 (1969), and tended "to cut [the courts] loose from the force of precedent, allowing [them] to restructure artificially those expectations legitimately created by extant law and thereby mitigate the practical force of *stare decisis*," *Mackey*, 401 U. S., at 680 (Harlan, J., concurring in judgment). All this was not denied by the doctrine's friends, who also viewed it as a device to "augmen[t] the power of the courts to contribute to the growth of the law in keeping with the demands of society," Mallamud, Prospective Limitation and the Rights of the Accused, 56 Iowa L. Rev. 321, 359 (1970), as "a deliberate and conscious technique of judicial lawmaking," Levy, 109 U. Pa. L. Rev., at 6, as a means of "facilitating more effective and defensible judicial lawmaking," *id.*, at 28.

Justice Harlan described this Court's embrace of the prospectivity principle as "the product of the Court's disquietude with the impacts of its fast-moving pace of constitutional innovation," *Mackey, supra,* at 676. The Court itself, however, glowingly described the doctrine as the cause rather than the effect of innovation, extolling it as a "technique" providing the "impetus . . . for the implementation of long overdue reforms." *Jenkins* v. *Delaware*, 395 U. S. 213, 218 (1969). Whether cause or effect, there is no doubt that the era which gave birth to the prospectivity principle was marked by a newfound disregard for *stare decisis*. As one

commentator calculated, "[b]y 1959, the number of instances in which the Court had reversals involving constitutional issues had grown to sixty; in the two decades which followed, the Court overruled constitutional cases on no less than forty-seven occasions." Maltz, Some Thoughts on the Death of Stare Decisis in Constitutional Law, 1980 Wis. L. Rev. 467. It was an era when this Court cast overboard numerous settled decisions, and indeed even whole areas of law, with an unceremonious "heave-ho." See, *e. g., Mapp* v. *Ohio*, 367 U. S. 643 (1961) (overruling *Wolf* v. *Colorado*, 338 U. S. 25 (1949)); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (overruling *Betts* v. *Brady*, 316 U. S. 455 (1942)); *Miranda* v. *Arizona*, 384 U. S. 436, 479, n. 48 (1966) (overruling *Crooker* v. *California*, 357 U. S. 433 (1958), and *Cicenia* v. *Lagay*, 357 U. S. 504 (1958)); *Katz* v. *United States*, 389 U. S. 347 (1967) (overruling *Olmstead* v. *United States*, 277 U. S. 438 (1928), and *Goldman* v. *United States*, 316 U. S. 129 (1942)). To argue now that one of the jurisprudential tools of judicial activism from that period should be extended on grounds of *stare decisis* can only be described as paradoxical.[2]

In sum, I join the opinion of the Court because the doctrine of prospective decisionmaking is not in fact protected

[2] Contrary to the suggestion in the dissent, I am not arguing that we should "cast overboard our *entire* retroactivity doctrine with . . . [an] unceremonious heave-ho." *Post*, at 116 (emphasis added; internal quotation marks omitted). There is no need. We cast over the first half six Terms ago in *Griffith*, and deep-sixed most of the rest two Terms ago in *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529 (1991)—in neither case unceremoniously (in marked contrast to some of the overrulings cited in text). What little, if any, remains is teetering at the end of the plank and needs no more than a gentle nudge. But if the entire doctrine had been given a quick and unceremonious end, there could be no complaint on the grounds of *stare decisis;* as it was born, so should it die. I do not know the basis for the dissent's contention that I find the jurisprudence of the era that produced the doctrine of prospectivity "distasteful." *Post*, at 116. Much of it is quite appetizing. It is only the cavalier treatment of *stare decisis* and the invention of prospectivity that I have criticized here.

by our flexible rule of *stare decisis;* and because no friend of *stare decisis* would want it to be.

JUSTICE KENNEDY, with whom JUSTICE WHITE joins, concurring in part and concurring in the judgment.

I remain of the view that it is sometimes appropriate in the civil context to give only prospective application to a judicial decision. "[P]rospective overruling allows courts to respect the principle of *stare decisis* even when they are impelled to change the law in light of new understanding." *American Trucking Assns., Inc.* v. *Smith,* 496 U. S. 167, 197 (1990) (plurality opinion). When a court promulgates a new rule of law, prospective application functions "to avoid injustice or hardship to civil litigants who have justifiably relied on prior law." *Id.,* at 199 (internal quotation marks omitted). See *Phoenix* v. *Kolodziejski,* 399 U. S. 204, 213–215 (1970); *Cipriano* v. *City of Houma,* 395 U. S. 701, 706 (1969) *(per curiam); England* v. *Louisiana Bd. of Medical Examiners,* 375 U. S. 411, 422 (1964). And in my view retroactivity in civil cases continues to be governed by the standard announced in *Chevron Oil Co.* v. *Huson,* 404 U. S. 97, 106–107 (1971). Thus, for the reasons explained by JUSTICE O'CONNOR, *post,* at 113–117, I cannot agree with the Court's broad dicta, *ante,* at 95–97, that appears to embrace in the civil context the retroactivity principles adopted for criminal cases in *Griffith* v. *Kentucky,* 479 U. S. 314 (1987). As JUSTICE O'CONNOR has demonstrated elsewhere, the differences between the civil and criminal contexts counsel strongly against adoption of *Griffith* for civil cases. See *American Trucking Assns., Inc.* v. *Smith, supra,* at 197–199. I also cannot accept the Court's conclusion, *ante,* at 96–99, which is based on JUSTICE SOUTER's opinion in *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529, 540–543 (1991), that a decision of this Court must be applied in a retroactive manner simply because the rule of law there announced happened to be applied to the parties then before the Court.

See *post*, at 117–122 (O'CONNOR, J., dissenting); *James B. Beam Distilling Co.* v. *Georgia, supra,* at 550–552 (O'CONNOR, J., dissenting). For these reasons, I do not join Part II of the Court's opinion.

I nonetheless agree with the Court that *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803 (1989), must be given retroactive effect. The first condition for prospective application of any decision is that it must announce a new rule of law. *Ashland Oil, Inc.* v. *Caryl,* 497 U. S. 916, 918 (1990) *(per curiam); American Trucking Assns., Inc.* v. *Smith, supra,* at 179; *United States* v. *Johnson,* 457 U. S. 537, 550, n. 12 (1982); *Chevron Oil Co.* v. *Huson,* 404 U. S., at 106–107. The decision must "overrul[e] clear past precedent on which litigants may have relied" or "decid[e] an issue of first impression whose resolution was not clearly foreshadowed." *Id.,* at 106. Because *Davis* did neither, it did not announce new law and therefore must be applied in a retroactive manner.

Respondent argues that two new principles of law were established in *Davis.* First, it points to the holding that 4 U. S. C. § 111, in which the United States consents to state taxation of the compensation of "an officer or employee of the United States," applies to federal retirees as well as current federal employees. Brief for Respondent 16–18. See *Davis,* 489 U. S., at 808–810. In *Davis,* however, we indicated that this holding was "dictate[d]" by "the plain language of the statute," *id.,* at 808, and we added for good measure our view that the language of the statute was "unambiguous," "unmistakable," and "leaves no room for doubt," *id.,* at 809, n. 3, 810. Given these characterizations, it is quite implausible to contend that in this regard *Davis* decided "an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil, supra,* at 106.

The second new rule respondent contends the Court announced in *Davis* was that the state statute at issue discriminated against federal retirees even though the statute treated them like all other state taxpayers except state em-

ployees. Brief for Respondent 18–26. See *Davis, supra*, at 814, 815, n. 4. The *Davis* Court, however, anchored its decision in precedent. We observed that in *Phillips Chemical Co.* v. *Dumas Independent School Dist.*, 361 U. S. 376 (1960), "we faced th[e] precise situation" confronting us in *Davis*, and so *Phillips Chemical* controlled our holding. 489 U. S., at 815, n. 4. To be sure, JUSTICE STEVENS in dissent disagreed with these contentions and attempted to distinguish *Phillips Chemical.* 489 U. S., at 824–826. The Court, however, was not persuaded at the time, and I remain convinced that the Court had the better reading of *Phillips Chemical.* A contrary holding in *Davis*, in my view, would have created a clear inconsistency in our jurisprudence. Under *Chevron Oil*, application of precedent which directly controls is not the stuff of which new law is made.

Far from being "revolutionary," *Ashland Oil Co.* v. *Caryl, supra*, at 920, or "an avulsive change which caused the current of the law thereafter to flow between new banks," *Hanover Shoe, Inc.* v. *United Shoe Machinery Co.*, 392 U. S. 481, 499 (1968), *Davis* was a mere application of plain statutory language and existing precedent. In these circumstances, this Court is not free to mitigate any financial hardship that might befall Virginia's taxpayers as a result of their state government's failure to reach a correct understanding of the unambiguous dictates of federal law.

Because I do not believe that *Davis* v. *Michigan Dept. of Treasury, supra*, announced a new principle of law, I have no occasion to consider JUSTICE O'CONNOR's argument, *post*, at 131–136, that equitable considerations may inform the formulation of remedies when a new rule is announced. In any event, I do not read Part III of the Court's opinion as saying anything inconsistent with what JUSTICE O'CONNOR proposes.

On this understanding, I join Parts I and III of the Court's opinion and concur in its judgment.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, dissenting.

Today the Court applies a new rule of retroactivity to impose crushing and unnecessary liability on the States, precisely at a time when they can least afford it. Were the Court's decision the product of statutory or constitutional command, I would have no choice but to join it. But nothing in the Constitution or statute requires us to adopt the retroactivity rule the majority now applies. In fact, longstanding precedent requires the opposite result. Because I see no reason to abandon our traditional retroactivity analysis as articulated in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106–107 (1971), and because I believe the Supreme Court of Virginia correctly applied *Chevron Oil* in this case, I would affirm the judgment below.

I

This Court's retroactivity jurisprudence has become somewhat chaotic in recent years. Three Terms ago, the case of *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167 (1990), produced three opinions, none of which garnered a majority. One Term later, *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529 (1991), yielded five opinions; there, no single writing carried more than three votes. As a result, the Court today finds itself confronted with such disarray that, rather than relying on precedent, it must resort to vote counting: Examining the various opinions in *Jim Beam*, it discerns six votes for a single proposition that, in its view, controls this case. *Ante*, at 96–97.

If we had given appropriate weight to the principle of *stare decisis* in the first place, our retroactivity jurisprudence never would have become so hopelessly muddled. After all, it was not that long ago that the law of retroactivity for civil cases was considered well settled. In *Chevron Oil Co.*, we explained that whether a decision will be nonretroactive depends on whether it announces a new rule, whether prospectivity would undermine the purposes of the

rule, and whether retroactive application would produce injustice. 404 U. S., at 106–107. Even when this Court adjusted the retroactivity rule for criminal cases on direct review some six years ago, we reaffirmed the vitality of *Chevron Oil*, noting that retroactivity in civil cases "continues to be governed by the standard announced in *Chevron Oil Co.* v. *Huson.*" *Griffith* v. *Kentucky*, 479 U. S. 314, 322, n. 8 (1987). In *American Trucking Assns., supra*, however, a number of Justices expressed a contrary view, and the jurisprudential equivalent of entropy immediately took over. Whatever the merits of any retroactivity test, it cannot be denied that resolution of the case before us would be simplified greatly had we not disregarded so needlessly our obligation to follow precedent in the first place.

I fear that the Court today, rather than rectifying that confusion, reinforces it still more. In the usual case, of course, retroactivity is not an issue; the courts simply apply their best understanding of current law in resolving each case that comes before them. *James B. Beam*, 501 U. S., at 534, 535–536 (SOUTER, J.). But where the law changes in some respect, the courts sometimes may elect not to apply the new law; instead, they apply the law that governed when the events giving rise to the suit took place, especially where the change in law is abrupt and the parties may have relied on the prior law. See *id.*, at 534. This can be done in one of two ways. First, a court may choose to make the decision purely prospective, refusing to apply it not only to the parties before the court but also to *any* case where the relevant facts predate the decision. *Id.*, at 536. Second, a court may apply the rule to some but not all cases where the operative events occurred before the court's decision, depending on the equities. See *id.*, at 537. The first option is called "pure prospectivity" and the second "selective prospectivity."

As the majority notes, *ante*, at 96–97, six Justices in *James B. Beam, supra*, expressed their disagreement with selective prospectivity. Thus, even though there was no majority

opinion in that case, one can derive from that case the proposition the Court announces today: Once "this Court applies a rule of federal law to the parties before it, that rule . . . must be given full retroactive effect in all cases still open on direct review." *Ante*, at 97. But no decision of this Court forecloses the possibility of pure prospectivity—refusal to apply a new rule in the very case in which it is announced and every case thereafter. As JUSTICE WHITE explained in his concurrence in *James B. Beam*, "[t]he propriety of prospective application of decision in this Court, in both constitutional and statutory cases, is settled by our prior decisions." 501 U. S., at 546 (opinion concurring in judgment).

Rather than limiting its pronouncements to the question of selective prospectivity, the Court intimates that pure prospectivity may be prohibited as well. See *ante*, at 97 (referring to our lack of " 'constitutional authority . . . to disregard current law' "); *ibid.* (relying on " 'basic norms of constitutional adjudication' " (quoting *Griffith, supra*, at 322)); see also *ante*, at 94 (touting the "fundamental rule of 'retrospective operation' " of judicial decisions). The intimation is incorrect. As I have explained before and will touch upon only briefly here:

> "[W]hen the Court changes its mind, the law changes with it. If the Court decides, in the context of a civil case or controversy, to change the law, it must make [a] determination whether the new law or the old is to apply to conduct occurring before the law-changing decision. *Chevron Oil* describes our long-established procedure for making this inquiry." *James B. Beam, supra*, at 550 (O'CONNOR, J., dissenting) (internal quotation marks omitted).

Nor can the Court's suggestion be squared with our cases, which repeatedly have announced rules of purely prospective effect. See, *e. g., Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 88 (1982); *Chevron Oil*, 404

U. S., at 106–107; *Phoenix* v. *Kolodziejski*, 399 U. S. 204, 214 (1970); *Cipriano* v. *City of Houma*, 395 U. S. 701, 706 (1969); see also *American Trucking Assns.*, 496 U. S., at 188–200 (plurality opinion) (canvassing the Court's retroactivity jurisprudence); *ante*, at 110 (KENNEDY, J., concurring in part and concurring in judgment) (citing cases).

In any event, the question of pure prospectivity is not implicated here. The majority first holds that once a rule *has been* applied retroactively, the rule must be applied retroactively to all cases thereafter. *Ante*, at 97. Then it holds that *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989), in fact retroactively applied the rule it announced. *Ante*, at 98–99. Under the majority's approach, that should end the matter: Because the Court applied the rule retroactively in *Davis*, it must do so here as well. Accordingly, there is no reason for the Court's careless dictum regarding pure prospectivity, much less dictum that is contrary to clear precedent.

Plainly enough, JUSTICE SCALIA would cast overboard our entire retroactivity doctrine with precisely the "unceremonious 'heave-ho'" he decries in his concurrence. See *ante*, at 109. Behind the undisguised hostility to an era whose jurisprudence he finds distasteful, JUSTICE SCALIA raises but two substantive arguments, both of which were raised in *James B. Beam*, 501 U. S., at 549 (SCALIA, J., concurring in judgment), and neither of which has been adopted by a majority of this Court. JUSTICE WHITE appropriately responded to those arguments then, see *id.*, at 546 (opinion concurring in judgment), and there is no reason to repeat the responses now. As Justice Frankfurter explained more than 35 years ago:

> "We should not indulge in the fiction that the law now announced has always been the law . . . . It is much more conducive to law's self-respect to recognize candidly the considerations that give prospective content to

a new pronouncement of law." *Griffin* v. *Illinois*, 351 U. S. 12, 26 (1956) (opinion concurring in judgment).

## II

I dissented in *James B. Beam* because I believed that the absolute prohibition on selective prospectivity was not only contrary to precedent, but also so rigid that it produced unconscionable results. I would have adhered to the traditional equitable balancing test of *Chevron Oil* as the appropriate method of deciding the retroactivity question in individual cases. But even if one believes the prohibition on selective prospectivity desirable, it seems to me that the Court today takes that judgment to an illogical—and inequitable—extreme. It is one thing to say that, where we have considered prospectivity in a prior case and rejected it, we must reject it in every case thereafter. But it is quite another to hold that, because we did *not* consider the possibility of prospectivity in a prior case and instead applied a rule retroactively through inadvertence, we are foreclosed from considering the issue forever thereafter. Such a rule is both contrary to established precedent and at odds with any notion of fairness or sound decisional practice. Yet that is precisely the rule the Court appears to adopt today. *Ante,* at 96–97.

### A

Under the Court's new approach, we have neither authority nor discretion to consider the merits of applying *Davis* v. *Michigan Dept. of Treasury, supra,* retroactively. Instead, we must inquire whether any of our previous decisions happened to have applied the *Davis* rule retroactively to the parties before the Court. Deciding whether we in fact have applied *Davis* retroactively turns out to be a rather difficult matter. Parsing the language of the *Davis* opinion, the Court encounters a single sentence it declares determinative: "The State having conceded that a refund is appropriate in

these circumstances, see Brief for Appellee 63, to the extent appellant has paid taxes pursuant to this invalid tax scheme, he is entitled to a refund." *Id.*, at 817 (quoted in part, *ante*, at 98). According to the majority, that sentence constitutes " 'consideration of remedial issues' " and therefore " 'necessarily' " indicates that we applied the rule in *Davis* retroactively to the parties before us. *Ante*, at 98 (quoting *James B. Beam, supra*, at 539 (opinion of SOUTER, J.)). Ironically, respondent and its *amici* draw precisely the opposite conclusion from the same sentence. According to them, the fact that Michigan conceded that it would offer relief meant that we had no reason to decide the question of retroactivity in *Davis*. Michigan was willing to provide relief whether or not relief was required. The Court simply accepted that offer and preserved the retroactivity question for another day.

One might very well debate the meaning of the single sentence on which everyone relies. But the debate is as meaningless as it is indeterminate. In *Brecht* v. *Abrahamson*, 507 U. S. 619 (1993), we reaffirmed our longstanding rule that, if a decision does not "squarely addres[s] [an] issue," this Court remains "free to address [it] on the merits" at a later date. *Id.*, at 631. Accord, *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38 (1952) (issue not "raised in briefs or argument nor discussed in the opinion of the Court" cannot be taken as "a binding precedent on th[e] point"); *Webster* v. *Fall*, 266 U. S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not considered as having been so decided as to constitute precedents"). The rule can be traced back to some of the earliest of this Court's decisions. See statement of Marshall, C. J., as reported in the arguments of counsel in *United States* v. *More*, 3 Cranch 159, 172 (1805) ("No question was made, in that case, as to the jurisdiction. It passed *sub silentio*, and the court does not consider itself as bound by that case"). Regardless of

how one reads the solitary sentence upon which the Court relies, surely it does not "squarely address" the question of retroactivity; it does not even mention retroactivity. At best, by addressing the question of remedies, the sentence implicitly "assumes" the rule in *Davis* to be retroactive. Our decision in *Brecht*, however, makes it quite clear that unexamined assumptions do not bind this Court. *Brecht, supra,* at 631 (That the Court "assumed the applicability of" a rule does not bind the Court to the assumption).

In fact, there is far less reason to consider ourselves bound by precedent today than there was in *Brecht*. In *Brecht*, the issue was not whether a legal question was resolved by a single case; it was whether our consistent practice of applying a particular rule, *Chapman* v. *California,* 386 U. S. 18, 24 (1967), to cases on collateral review precluded us from limiting the rule's application to cases on direct review. Because none of our prior cases directly had addressed the applicability of *Chapman* to cases on collateral review—each had only assumed it applied—the Court held that those cases did not bind us to any particular result. See *Brecht, supra,* at 630–631. I see no reason why a single retroactive application of the *Davis* rule, inferred from the sparse and ambiguous language of *Davis* itself, should carry more weight here than our consistent practice did in *Brecht*.

The Court offers no justification for disregarding the settled rule we so recently applied in *Brecht*. Nor do I believe it could, for the rule is not a procedural nicety. On the contrary, it is critical to the soundness of our decisional processes. It should go without saying that any decision of this Court has wide-ranging applications; nearly every opinion we issue has effects far beyond the particular case in which it issues. The rule we applied in *Brecht*, which limits the *stare decisis* effect of our decisions to questions actually considered and passed on, ensures that this Court does not decide important questions by accident or inadvertence. By adopting a contrary rule in the area of retroactivity, the

Court now permanently binds itself to its every unexamined assumption or inattention. Any rule that creates a grave risk that we might resolve important issues of national concern *sub silentio*, without thought or consideration, cannot be a wise one.

This case demonstrates the danger of such a rule. The question of retroactivity was never briefed in *Davis*. It had not been passed upon by the court below. And it was not within the question presented. Indeed, at oral argument we signaled that we would *not* pass upon the retroactivity of the rule *Davis* would announce. After conceding that the Michigan Department of Taxation would give Davis himself a refund if he prevailed, counsel for the department argued that it would be unfair to require Michigan to provide refunds to the 24,000 taxpayers who were not before the Court. The following colloquy ensued:

> "[COURT]: So why do we have to answer that at all?
> "[MICHIGAN]: —if, if this Court issues an opinion stating that the current Michigan classification is unconstitutional or in violation of the statute, there are these 24,000 taxpayers out there.
>
> .    .    .    .    .
>
> "[COURT]: But that's not—it's not here, is it? Is that question here?
> "[MICHIGAN]: It is not specifically raised, no." Tr. of Oral Arg., O. T. 1988, No. 87–1020, pp. 37–38.

Now, however, the Court holds that the question was implicitly before us and that, even though the *Davis* opinion does not even discuss the question of retroactivity, it resolved the issue conclusively and irretrievably.

If *Davis* somehow did decide that its rule was to be retroactive, it was by chance and not by design. The absence of briefing, argument, or even mention of the question belies any suggestion that the issue was given thoughtful consideration. Even the author of the *Davis* opinion refuses to ac-

cept the notion that *Davis* resolved the question of retroactivity. Instead, JUSTICE KENNEDY applies the analysis of *Chevron Oil* to resolve the retroactivity question today. See *ante*, at 110–112 (opinion concurring in part and concurring in judgment).

The Court's decision today cannot be justified by comparison to our decision in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), which abandoned selective prospectivity in the criminal context. *Ante*, at 97. As I explained in *American Trucking Assns.*, 496 U. S., at 197–200, there are significant differences between criminal and civil cases that weigh against such an extension. First, nonretroactivity in criminal cases historically has favored the government's reliance interests over the rights of criminal defendants. As a result, the generalized policy of favoring individual rights over governmental prerogative can justify the elimination of prospectivity in the criminal arena. The same rationale cannot apply in civil cases, as nonretroactivity in the civil context does not necessarily favor plaintiffs or defendants; "nor is there any policy reason for protecting one class of litigants over another." *Id.*, at 198. More important, even a party to civil litigation who is "deprived of the full retroactive benefit of a new decision may receive some relief." *Id.*, at 198–199. Here, for example, petitioners received the benefit of prospective invalidation of Virginia's taxing scheme. From this moment forward, they will be treated on an equal basis with all other retirees, the very treatment our intergovernmental immunity cases require. The criminal defendant, in contrast, is usually interested only in one remedy—reversal of his conviction. *That* remedy can be obtained only if the rule is applied retroactively. See *id.*, at 199.

Nor can the Court's rejection of selective retroactivity in the civil context be defended on equal treatment grounds. See *Griffith, supra*, at 323 (selective retroactivity accords a benefit to the defendant in whose case the decision is announced but not to any defendant thereafter). It may well

be that there is little difference between the criminal defendant in whose case a decision is announced and the defendant who seeks certiorari on the same question two days later. But in this case there is a tremendous difference between the defendant in whose case the *Davis* rule was announced and the defendant who appears before us today: The latter litigated and preserved the retroactivity question while the former did not. The Michigan Department of Taxation did not even brief the question of retroactivity in *Davis*. Respondent, in contrast, actually prevailed on the question in the court below.

If the Court is concerned with equal treatment, that difference should be dispositive. Having failed to demand the unusual, prospectivity, respondent in *Davis* got the usual—namely, retroactivity. Respondent in this case *has* asked for the unusual. In fact, respondent here defends a judgment below that awarded it just that. I do not see how the principles of equality can support forcing the Commonwealth of Virginia to bear the harsh consequences of retroactivity simply because, years ago, the Michigan Department of Taxation failed to press the issue—and we neglected to consider it. Instead, the principles of fairness favor addressing the contentions the Virginia Department of Taxation presses before us by applying *Chevron Oil* today. It is therefore to *Chevron Oil* that I now turn.

B

Under *Chevron Oil*, whether a decision of this Court will be applied nonretroactively depends on three factors. First, as a threshold matter, "the decision to be applied nonretroactively must establish a new principle of law." 404 U. S., at 106. Second, nonretroactivity must not retard the new rule's operation in light of its history, purpose, and effect. *Id.*, at 107. Third, nonretroactivity must be necessary to avoid the substantial injustice and hardship that a holding of retroactivity might impose. *Ibid.* In my view, all three factors favor holding our decision in *Davis* nonretroactive.

1

As JUSTICE KENNEDY points out in his concurrence, *ante*, at 111, a decision cannot be made nonretroactive unless it announces "a new principle of law." *Chevron Oil*, 404 U. S., at 106. For purposes of civil retroactivity, *Chevron Oil* identifies two types of decisions that can be new. First, a decision is new if it overturns "clear past precedent on which litigants may have relied." *Ibid.; ante*, at 111 (KENNEDY, J., concurring in part and concurring in judgment). I agree with JUSTICE KENNEDY that *Davis* did not represent such a " 'revolutionary' " or " 'avulsive change' " in the law. *Ante*, at 112 (quoting *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 499 (1968)).

Nonetheless, *Chevron* also explains that a decision may be "new" if it resolves "an issue of first impression whose resolution was not *clearly* foreshadowed." *Chevron Oil, supra*, at 106 (emphasis added). Thus, even a decision that is "controlled by the . . . principles" articulated in precedent may announce a new rule, so long as the rule was "sufficiently debatable" in advance. *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073, 1109 (1983) (O'CONNOR, J., concurring). Reading the *Davis* opinion alone, one might get the impression that it did not announce a new rule even of that variety. The opinion's emphatic language suggests that the outcome was not even debatable. See *ante*, at 111 (KENNEDY, J., concurring in part and concurring in judgment). In my view, however, assertive language is not itself determinative. As THE CHIEF JUSTICE explained for the Court in a different context:

> "[T]he fact that a court says that its decision . . . is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' . . . . Courts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even

when aware of reasonable contrary conclusions reached by other courts." *Butler* v. *McKellar,* 494 U. S. 407, 415 (1990).

In *Butler,* we determined that the rule announced in *Arizona* v. *Roberson,* 486 U. S. 675 (1988), was "new" for purposes of *Teague* v. *Lane,* 489 U. S. 288 (1989), despite *Roberson's* repeated assertions that its rule was "directly controlled" by precedent. Indeed, we did not even feel bound by the opinion's statement that it was not announcing a new rule at all but rather declining to create an exception to an existing rule. While *Teague* and its progeny may not provide the appropriate standard of novelty for *Chevron Oil* purposes, their teaching—that whether an opinion is new depends not on its language or tone but on the legal landscape from which it arose—obtains nonetheless.

In any event, JUSTICE STEVENS certainly thought that *Davis* announced a new rule. In fact, he thought that the rule was not only unprecedented, but wrong: "The Court's holding is not supported by the rationale for the intergovernmental immunity doctrine and is not compelled by our previous decisions. I cannot join the unjustified, court-imposed restriction on a State's power to administer its own affairs." 489 U. S., at 818–819 (dissenting opinion). And just last Term two Members of this Court expressed their disagreement with the decision in *Davis,* labeling its application of the doctrine of intergovernmental immunity "perverse." *Barker* v. *Kansas,* 503 U. S. 594, 606 (1992) (STEVENS, J., joined by THOMAS, J., concurring). Although I would not call our decision in *Davis* perverse, I agree that its rule was sufficiently debatable in advance as to fall short of being "clearly foreshadowed." The great weight of authority is in accord.*

---

*\**Swanson* v. *Powers,* 937 F. 2d 965, 968, 970, 971 (CA4 1991) ("The most pertinent judicial decisions" were contrary to a holding of immunity and "the rationale behind the precedent might have suggested a different re-

In fact, before *Davis* was announced, conventional wisdom seemed to be directly to the contrary. One would think that, if *Davis* was "clearly foreshadowed," some taxpayer might have made the intergovernmental immunity argument before. No one had. Twenty-three States had taxation schemes just like the one at issue in *Davis;* and some of those schemes were established as much as half a century before *Davis* was decided. See *Harper* v. *Virginia Dept. of Taxation,* 241 Va. 232, 237, 401 S. E. 2d 868, 871 (1991). Yet not a single taxpayer ever challenged one of those schemes on intergovernmental immunity grounds until Davis challenged Michigan's in 1984. If Justice Holmes is correct that "[t]he prophecies of what the courts will do in fact, and nothing more pretentious" are "law," O. Holmes, The Path of the Law, in Collected Legal Papers 167, 173 (1920), then surely *Davis* announced *new* law; the universal "prophecy" before *Davis* seemed to be that such taxation schemes were valid.

An examination of the decision in *Davis* and its predecessors reveals that *Davis* was anything but clearly foreshadowed. Of course, it was well established long before *Davis* that the nondiscrimination principle of 4 U. S. C. § 111 and the doctrine of intergovernmental immunity prohibit a State from imposing a discriminatory tax on the United States or

---

sult in [*Davis* itself]"; "how the intergovernmental tax immunity doctrine and 4 U. S. C. § 111 applied to [plans like the one at issue in *Davis*] was anything but clearly established prior to *Davis*"); *Harper* v. *Virginia Dept. of Taxation,* 241 Va. 232, 238, 401 S. E. 2d 868, 872 (1991) ("[T]he *Davis* decision established a new rule of law by deciding an issue of first impression whose resolution was not clearly foreshadowed"); *Swanson* v. *State,* 329 N. C. 576, 583, 407 S. E. 2d 791, 794 (1991) ("[T]he decision of *Davis* was not clearly foreshadowed"); *Bass* v. *State,* 302 S. C. 250, 256, 395 S. E. 2d 171, 174 (1990) (*Davis* "established a new principle of law"); *Bohn* v. *Waddell,* 164 Ariz. 74, 92, 790 P. 2d 772, 790 (1990) (*Davis* "established a new principle of law"); Note, Rejection of the "Similarly Situated Taxpayer" Rationale: *Davis v. Michigan Department of Treasury,* 43 Tax Lawyer 431, 441 (1990) ("The majority in *Davis* rejected a long-standing doctrine").

those who do business with it. The income tax at issue in *Davis*, however, did not appear discriminatory on its face. Like the Virginia income tax at issue here, it did not single out federal employees or retirees for disfavored treatment. Instead, federal retirees were treated identically to all other retirees, with a single and numerically insignificant exception—retirees whose retirement benefits were paid by the State. Whether such an exception rendered the tax "discriminatory" within the meaning of the intergovernmental immunity doctrine, it seems to me, was an open question. On the one hand, the tax scheme did distinguish between federal retirees and state retirees: The former were required to pay state taxes on their retirement income, while the latter were not. But it was far from clear that such was the proper comparison. In fact, there were strong arguments that it was not.

As JUSTICE STEVENS explained more thoroughly in his *Davis* dissent, 489 U. S., at 819—and as we have recognized since *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819)—intergovernmental immunity is necessary to prevent the States from interfering with federal interests through taxation. Because the National Government has no recourse to the state ballot box, it has only a limited ability to protect itself against excessive state taxes. But the risk of excessive taxation of federal interests is eliminated, and "[a] 'political check' is provided, when a state tax falls" not only on the Federal Government, but also *"on a significant group of state citizens* who can be counted upon to use their votes to keep the State from raising the tax excessively, and thus placing an unfair burden on the Federal Government." *Washington* v. *United States*, 460 U. S. 536, 545 (1983) (emphasis added). Accord, *United States* v. *County of Fresno*, 429 U. S. 452, 462–464 (1977); *South Carolina* v. *Baker*, 485 U. S. 505, 526, n. 15 (1988).

There can be no doubt that the taxation scheme at issue in *Davis* and the one employed by the Commonwealth of

Virginia provided that necessary "political check." They exempted only a small group of citizens, state retirees, while subjecting the remainder of their citizens—federal retirees, retirees who receive income from private sources, and non-retirees alike—to a uniform income tax. As a result, any attempt to increase income taxes excessively so as to interfere with federal interests would have caused the similarly taxed populace to "use their votes" to protect their interests, thereby protecting the interests of the Federal Government as well. There being no risk of abusive taxation of the National Government, there was a good argument that there should have been no intergovernmental immunity problem either. See *Davis*, 489 U. S., at 821–824 (STEVENS, J., dissenting).

In addition, distinguishing between taxation of state retirees and all others, including private and federal retirees, was justifiable from an economic standpoint. The State, after all, does not merely collect taxes from its retirees; it pays their benefits as well. As a result, it makes no difference to the State or the retirees whether the State increases state retirement benefits in an amount sufficient to cover taxes it imposes, or whether the State offers reduced benefits and makes them tax free. The net income level of the retirees and the impact on the state fisc is the same. Thus, the Michigan Department of Taxation had a good argument that its differential treatment of state and federal retirees was "directly related to, and justified by, [a] significant differenc[e] between the two classes," *id.*, at 816 (internal quotation marks omitted): Taxing federal retirees enhances the State's fisc, whereas taxing state retirees does not.

I recite these arguments not to show that the decision in *Davis* was wrong—I joined the opinion then and remain of the view that it was correct—but instead to point out that the arguments on the other side were substantial. Of course, the Court was able to "ancho[r] its decision in precedent," *ante*, at 112 (KENNEDY, J., concurring in part and con-

curring in judgment). But surely that cannot be dispositive. Few decisions are so novel that there is no precedent to which they may be moored. What is determinative is that the decision was "sufficiently debatable" *ex ante* that, under *Chevron Oil,* nonretroactivity cannot be precluded. *Arizona Governing Committee* v. *Norris,* 463 U. S., at 1109 (O'CONNOR, J., concurring). That, it seems to me, is the case here.

2

The second *Chevron Oil* factor is whether denying the rule retroactive application will retard its operation in light of the rule's history, purpose, and effect. 404 U. S., at 107. That factor overwhelmingly favors respondent. The purpose of the intergovernmental immunity doctrine is to protect the rights of the Federal Sovereign against state interference. It does not protect the private rights of individuals:

> "[T]he purpose of the immunity was not to confer benefits on the employees by relieving them from contributing their share of the financial support of the other government . . . , but to prevent undue interference with the one government by imposing on it the tax burdens of the other." *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 483–484 (1939) (footnote omitted).

Accord, *Davis, supra,* at 814 ("[I]ntergovernmental tax immunity is based on the need to protect each sovereign's governmental operations from undue interference by the other"). Affording petitioners retroactive relief in this case would not vindicate the interests of the Federal Government. Instead, it lines the pockets of the Government's former employees. It therefore comes as no surprise that the United States, despite its consistent participation in intergovernmental immunity cases in the past, has taken no position here. Because retroactive application of the rule in *Davis* serves petitioners' interests but not the interests intergov-

ernmental immunity was meant to protect—the Federal Government's—denying *Davis* retroactive application would not undermine the decision's purpose or effect.

### 3

The final factor under *Chevron Oil* is whether the decision " 'could produce substantial inequitable results if applied retroactively.' " *Chevron Oil, supra,* at 107 (quoting *Cipriano* v. *City of Houma,* 395 U. S., at 706). We repeatedly have declined to give our decisions retroactive effect where doing so would be unjust. In *Arizona Governing Committee* v. *Norris, supra,* for example, we declined to apply a Title VII decision retroactively, noting that the resulting "unanticipated financial burdens would come at a time when many States and local governments are struggling to meet substantial fiscal deficits." *Id.,* at 1106–1107 (Powell, J., joined by Burger, C. J., BLACKMUN, REHNQUIST, and O'CONNOR, JJ.). There was "no justification" for "impos[ing] this magnitude of burden retroactively on the public," we concluded. *Id.,* at 1107. Accord, *id.,* at 1107–1111 (O'CONNOR, J., concurring); see *id.,* at 1075 *(per curiam).* Similarly, we declined to afford the plaintiff full retroactive relief in *Los Angeles Dept. of Water and Power* v. *Manhart,* 435 U. S. 702, 718–723 (1978) (STEVENS, J.). There, too, we explained that "[r]etroactive liability could be devastating" and that "[t]he harm would fall in large part on innocent third parties." *Id.,* at 722–723.

Those same considerations exist here. Retroactive application of rulings that invalidate state tax laws have the potential for producing "disruptive consequences for the State[s] and [their] citizens. A refund, if required by state or federal law, could deplete the state treasur[ies], thus threatening the State[s'] current operations and future plans." *American Trucking Assns., Inc.* v. *Smith,* 496 U. S., at 182 (plurality opinion). Retroactive application of *Davis* is no exception. "The fiscal implications of *Davis* for the

[S]tates," one commentator has noted, "are truly stagger-ing." Hellerstein, Preliminary Reflections on McKesson and American Trucking Associations, 48 Tax Notes 325, 336 (1990). The States estimate that their total liability will exceed $1.8 billion. Brief for Respondent SA–1; Brief for State of Utah et al. as *Amici Curiae* 12–13. Virginia's share alone exceeds $440 million. Brief for Respondent SA–1; Brief for State of Utah et al. as *Amici Curiae* 12–13. This massive liability could not come at a worse time. See Wall Street Journal, July 27, 1992, p. A2 ("Most states are in dire fiscal straits, and their deteriorating tax base is making it harder for them to get out, a survey of legislatures indicates"). Accord, *Harper* v. *Virginia Dept. of Taxation*, 241 Va., at 239–240, 401 S. E. 2d, at 873 (such massive liability "would have a potentially disruptive and destructive impact on the Commonwealth's planning, budgeting, and delivery of essential state services"); *Swanson* v. *State*, 329 N. C. 576, 583, 407 S. E. 2d 791, 794 (1991) ("this State is in dire financial straits" and $140 million in refunds would exacerbate it); *Bass* v. *State*, 302 S. C. 250, 256, 395 S. E. 2d 171, 174 (1990) ($200 million in refunds "would impose a severe financial burden on the State and its citizens [and] endanger the financial integrity of the State"). To impose such liability on Virginia and the other States that relied in good faith on their taxation laws, "at a time when most States are struggling to fund even the most basic services, is the height of unfairness." *James B. Beam*, 501 U. S., at 558 (O'CONNOR, J., dissenting).

It cannot be contended that such a burden is justified by the States' conduct, for the liability is entirely disproportionate to the offense. We do not deal with a State that willfully violated the Constitution but rather one that acted entirely in good faith on the basis of an unchallenged statute. Moreover, during the four years in question, the constitutional violation produced a benefit of approximately $8 million to $12 million per year, Tr. of Oral Arg. 33, 36, and that benefit accrued not to the Commonwealth but to individual retirees.

Yet, for that $32 million to $48 million error, the Court now allows the imposition of liability well in excess of $400 million dollars. Such liability is more than just disproportionate; it is unconscionable. Finally and perhaps most important, this burden will not fall on some thoughtless government official or even the group of retirees that benefited from the offending exemption. Instead the burden falls squarely on the backs of the blameless and unexpecting taxpayers of the affected States who, although they profited not at all from the exemption, will now be forced to pay higher taxes and be deprived of essential services.

Petitioners, in contrast, would suffer no hardship if the Court refused to apply *Davis* retroactively. For years, 23 States enforced taxation schemes like the Commonwealth's in good faith, and for years not a single taxpayer objected on intergovernmental immunity grounds. No one put the States on notice that their taxing schemes might be constitutionally suspect. Denying *Davis* retroactive relief thus would not deny petitioners a benefit on which they had relied. It merely would deny them an unanticipated windfall. Because that windfall would come only at the cost of imposing hurtful consequences on innocent taxpayers and the communities in which they live, I believe the substantial inequity of imposing retroactive relief in this case, like the other *Chevron* factors, weighs in favor of denying *Davis* retroactive application.

### III

Even if the Court is correct that *Davis* must be applied retroactively in this case, there is the separate question of the *remedy* that must be given. The questions of retroactivity and remedy are analytically distinct. *American Trucking Assns., Inc.* v. *Smith, supra,* at 189 (plurality opinion) ("[T]he Court has never equated its retroactivity principles with remedial principles"). As JUSTICE SOUTER explained in *James B. Beam, supra,* at 534, retroactivity is a matter of choice of law "[s]ince the question is whether the court

should apply the old rule or the new one." When the retroactivity of a decision of this Court is in issue, the choice-of-law issue is a federal question. *Ashland Oil, Inc. v. Caryl,* 497 U. S. 916, 918 (1990) *(per curiam).*

The question of remedy, however, is quite different. The issue is not whether to apply new law or old law, but what relief should be afforded once the prevailing party has been determined under applicable law. See *James B. Beam,* 501 U. S., at 535 (SOUTER, J.) ("Once a rule is found to apply 'backward,' there may then be a further issue of remedies, *i. e.,* whether the party prevailing under a new rule should obtain the same relief that would have been awarded if the rule had been an old one"). The question of remedies is in the first instance a question of state law. See *ibid.* ("[T]he remedial inquiry is one governed by state law, at least where the case originates in state court"). In fact, the only federal question regarding remedies is whether the relief afforded is sufficient to comply with the requirements of due process. See *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U. S. 18, 31–52 (1990).

While the issue of retroactivity is properly before us, the question of remedies is not. It does not appear to be within the question presented, which asks only if *Davis* may be applied "nonretroactively so as to defeat federal retirees' entitlement to refunds." Pet. for Cert. i. Moreover, our consideration of the question at this juncture would be inappropriate, as the Supreme Court of Virginia has yet to consider what remedy might be available in light of *Davis'* retroactivity and applicable state law. The Court inexplicably discusses the question at length nonetheless, noting that if the Commonwealth of Virginia provides adequate predeprivation remedies, it is under no obligation to provide full retroactive refunds today. *Ante,* at 100–102.

When courts take it upon themselves to issue helpful guidance in dictum, they risk creating additional confusion by

inadvertently suggesting constitutional absolutes that do not exist. The Court's dictum today follows that course. Amidst its discussion of predeprivation and postdeprivation remedies, the Court asserts that a plaintiff who has been deprived a predeprivation remedy cannot be "confine[d] . . . to prospective relief." *Ante*, at 101, n. 10. I do not believe the Court's assertion to be correct.

Over 20 years ago, Justice Harlan recognized that the equities could be taken into account in determining the appropriate remedy when the Court announces a new rule of constitutional law:

> "To the extent that equitable considerations, for example, 'reliance,' are relevant, I would take this into account in the determination of what relief is appropriate in any given case. There are, of course, circumstances when a change in the law will jeopardize an edifice which was reasonably constructed on the foundation of prevailing legal doctrine." *United States* v. *Estate of Donnelly*, 397 U. S. 286, 296 (1970) (concurring opinion).

The commentators appear to be in accord. See Fallon & Meltzer, New Law, Non-Retroactivity, and Constitutional Remedies, 104 Harv. L. Rev. 1733 (1991) (urging consideration of novelty and hardship as part of the remedial framework rather than as a question of whether to apply old law or new). In my view, and in light of the Court's revisions to the law of retroactivity, it should be constitutionally permissible for the equities to inform the remedial inquiry. In a particularly compelling case, then, the equities might permit a State to deny taxpayers a full refund despite having refused them predeprivation process.

Indeed, some Members of this Court have argued that we recognized as much long ago. In *American Trucking Assns.*, 496 U. S., at 219–224 (dissenting opinion), JUSTICE STEVENS admitted that this Court repeatedly had applied the *Chevron Oil* factors to preclude the provision of mone-

tary relief. In JUSTICE STEVENS' view, however, *Chevron Oil* determined the question of remedy rather than which law would apply, new or old. See 496 U. S., at 220 (*Chevron Oil* and its progeny "establish a remedial principle for the exercise of equitable discretion by federal courts and not, as the plurality states, a choice-of-law principle applicable to all cases on direct review"); see also *ante*, at 95, n. 9 (reserving the possibility that *Chevron Oil* governs the question of remedies in federal court). If JUSTICE STEVENS' view or something like it has prevailed today—and it seems that it has—then state and federal courts still retain the ability to exercise their "equitable discretion" in formulating appropriate relief on a federal claim. After all, it would be wholly anomalous to suggest that federal courts are permitted to determine the scope of the remedy by reference to *Chevron Oil,* but that state courts are barred from considering the equities altogether. Not only would that unduly restrict state court "flexibility in the law of remedies," *Estate of Donnelly, supra,* at 297 (Harlan, J., concurring), but it also would turn federalism on its head. I know of no principle of law that permits us to restrict the remedial discretion of state courts without imposing similar restrictions on federal courts. Quite the opposite should be true, as the question of remedies in state court is generally a question of state law in the first instance. *James B. Beam,* 501 U. S., at 535 (SOUTER, J.).

The Court cites only a single case that might be read as precluding courts from considering the equities when selecting the remedy for the violation of a novel constitutional rule. That case is *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, supra. Ante,* at 101–102. But, as the controlling opinion in *James B. Beam* explains, *McKesson* cannot be so read. 501 U. S., at 544 ("Nothing we say here [precludes the right] to raise procedural bars to recovery under state law *or demonstrate reliance interests entitled to consideration in determining the nature of the remedy* that must be provided, *a matter with which McKes-*

*son did not deal"* (emphases added)). Accord, *id.*, at 543 ("[N]othing we say here precludes consideration of individual equities when deciding remedial issues in particular cases"). It is true that the Court in *McKesson* rejected, on due process grounds, the State of Florida's equitable arguments against the requirement of a full refund. But the opinion did not hold that those arguments were irrelevant as a categorical matter. It simply held that the equities in that case were insufficient to support the decision to withhold a remedy. The opinion expressly so states, rejecting the State's equitable arguments as insufficiently "weighty *in these circumstances." McKesson*, 496 U. S., at 45 (emphasis added).

The circumstances in *McKesson* were quite different than those here. In *McKesson*, the tax imposed was patently unconstitutional: The State of Florida collected taxes under its Liquor Tax statute even though this Court already had invalidated a "virtually identical" tax. *Id.*, at 46. Given that the State could "hardly claim surprise" that its statute was declared invalid, this Court concluded that the State's reliance on the presumptive validity of its statute was insufficient to preclude monetary relief. *Ibid.* As we explained in *American Trucking Assns.*, the large burden of retroactive relief is "largely irrelevant when a State violates constitutional norms well established under existing precedent." We cited *McKesson* as an example. 496 U. S., at 183 (plurality opinion).

A contrary reading of *McKesson* would be anomalous in light of this Court's immunity jurisprudence. The Federal Government, for example, is absolutely immune from suit absent an express waiver of immunity; and federal officers enjoy at least qualified immunity when sued in a *Bivens* action. *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). As a result, an individual who suffers a constitutional deprivation at the hands of a federal officer very well may have no access to backwards-looking (monetary) relief. I do not see why the Due Process Clause would

require a full, backwards-looking compensatory remedy whenever a governmental official reasonably taxes a citizen under what later turns out to be an unconstitutional statute but not where the officer deprives a citizen of her bodily integrity or her life.

In my view, if the Court is going to restrict authority to temper hardship by holding our decisions nonretroactive through the *Chevron Oil* factors, it must afford courts the ability to avoid injustice by taking equity into account when formulating the remedy for violations of novel constitutional rules. See Fallon & Meltzer, 104 Harv. L. Rev. 1733 (1991). Surely the Constitution permits this Court to refuse plaintiffs full backwards-looking relief under *Chevron Oil;* we repeatedly have done so in the past. *American Trucking Assns., supra,* at 188–200 (canvassing the Court's practice); see also *supra,* at 115–116, 129. I therefore see no reason why it would not similarly permit state courts reasonably to consider the equities in the exercise of their sound remedial discretion.

## IV

In my view, the correct approach to the retroactivity question before us was articulated in *Chevron Oil* some 22 years ago. By refusing to apply *Chevron Oil* today, the Court not only permits the imposition of grave and gratuitous hardship on the States and their citizens, but also disregards settled precedents central to the fairness and accuracy of our decisional processes. Nor does the Court cast any light on the nature of the regime that will govern from here on. To the contrary, the Court's unnecessary innuendo concerning pure prospectivity and ill-advised dictum regarding remedial issues introduce still greater uncertainty and disorder into this already chaotic area. Because I cannot agree with the Court's decision or the manifestly unjust results it appears to portend, I respectfully dissent.