# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2442

_____

Vickie Fogie, Joan Leonard, and        *
Angela Adams, on behalf of themselves   *
and all others similarly situated;       *
                                     *

           Plaintiffs - Appellees,      *
                                       *

       v.                                 *   Appeals from the United States
                                       *   District Court for the
THORN Americas, Inc.,            *   District of Minnesota.
                                       *

           Defendant - Appellant,      *
                                       *

THORN EMI North America       *
Holdings, Inc., a Delaware        *
corporation, *
                                       *

           Defendant - Appellant.      *

_____

No. 98-2447

_____

Vickie Fogie, Joan Leonard, and        *
Angela Adams, on behalf of themselves   *
and all others similarly situated;       *
                                     *

           Plaintiffs - Appellants,      *
                                     *

       v.                                 *
                                     *

THORN Americas, Inc., formerly     *
known as Rent-A-Center, Inc.,     *

                        *

        Defendant - Appellee,     *

                        *

THORN EMI North America     *
Holdings, Inc., A Delaware     *
corporation,     *

                        *

        Defendant - Appellee.     *

_____

Submitted:   May 10, 1999
Filed:   August 20, 1999

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Vickie Fogie, Joan Leonard, and Angela Adams filed a class-action lawsuit against THORN Americas, Inc. and its parent companies, including THORN EMI North America Holdings, Inc. (TEMINAH),[1] alleging the companies had violated Minnesota and federal law while operating a rent-to-own business. The District Court entered judgment for the plaintiff class on its claim that THORN Americas and TEMINAH committed usury in violation of Minnesota law by charging excessive

---

[1]THORN Americas, Inc. is a wholly owned subsidiary of THORN EMI, Inc., which is a wholly owned subsidiary of TEMINAH, the ultimate North American parent company. TEMINAH, in turn, is a wholly owned subsidiary of THORN EMI, plc, a British conglomerate that owns and operates businesses worldwide. The plaintiffs originally sued additional related companies such as THORN EMI (USA) Holdings, Inc., but these companies subsequently merged into THORN Americas or TEMINAH, thereby ceasing to have a separate corporate existence.

interest rates on credit sales of consumer goods. The plaintiffs recovered approximately $30 million in damages on their usury claim, and the District Court dismissed their other claims. THORN Americas and TEMINAH appeal several aspects of the District Court's damage award on the usury claim. The plaintiffs cross-appeal, claiming the District Court erred when it dismissed their claims that the defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968 (1994).

I.

As described in this Court's previous opinion, Fogie v. THORN Americas, Inc., 95 F.3d 645 (8th Cir. 1996), appellant THORN Americas operates stores called Rent-A-Centers (RAC)[2] that offer household goods, including furniture and appliances, for sale or lease. Customers choosing to lease goods enter rent-to-own agreements with RAC. Under the agreements, customers pay a portion of the goods' purchase price plus interest and take possession of the goods for an initial period of a week or month. At the end of this period, a customer either returns the goods or renews the agreement. Once a rent-to-own agreement has been renewed a designated number of times, the customer obtains ownership of the goods.

In 1991, several RAC customers in Minnesota (plaintiff class representatives Fogie, Leonard, and Adams) filed a class-action lawsuit against RAC, alleging that RAC had engaged in usury and deceptive and unlawful business practices. The plaintiffs claimed these practices violated several Minnesota statutes, including the Consumer Credit Sales Act (CCSA), Minn. Stat. § 325G.15-.16 (1998), and the General Usury Statute, Minn. Stat. § 334.01-.20 (1998). The plaintiffs also claimed

---

[2]This opinion, like our earlier opinion, uses RAC to refer collectively to THORN Americas and its parent companies, including appellant TEMINAH. We also capitalize "THORN," even when citing to other opinions, to reflect THORN's own practice.

that THORN Americas and its parent companies' actions violated several federal statutes, including RICO, § 18 U.S.C. §§ 1961-1968. Defending its practices, RAC argued that its rent-to-own agreements complied with Minnesota and federal law, in particular with Minnesota's Rental Purchase Agreement Act (RPAA), Minn. Stat. § 325F.84-.97 (1998).

In March 1993, the District Court certified the plaintiff class to include "all persons who have entered into rent to own contracts on or after August 1, 1990 in the State of Minnesota with the defendants or any of their predecessors or successors in interest in a written form substantially similar to that executed by plaintiff Fogie." Fogie v. Rent-A-Center, Inc., Civ. No. 4-92-533, slip op. at 17-18 (D. Minn. Mar. 2, 1993) (Memorandum Opinion and Order). The class certification encompasses individuals who entered approximately 58,000 agreements. The District Court also determined the rent-to-own agreements were "consumer credit sales" governed by the CCSA and entered partial summary judgment for the plaintiffs on their CCSA claim. See id. at 17. The court's decision to treat rent-to-own agreements as consumer credit sales governed by the CCSA was subsequently endorsed by the Minnesota Supreme Court in its response to the District Court's certified questions, Fogie v. Rent-A-Centers, Inc., 518 N.W.2d 544 (Minn. 1994), and in a separate case, Miller v. Colortyme, Inc., 518 N.W.2d 544 (Minn. 1994).

When answering the District Court's certified questions, the Minnesota Supreme Court also directed the District Court to apply the Minnesota General Usury Statute's limitation on interest rates to the rent-to-own agreements. See Fogie, 518 N.W.2d at 544. The District Court therefore declared RAC's rent-to-own agreements usurious as a matter of law under CCSA and the Minnesota General Usury Statute and "unlawful debt" under RICO. It permanently enjoined RAC from entering into rent-to-own agreements with interest rates exceeding the General Usury Statute's limits, voided the existing rent-to-own agreements with the plaintiff class ab initio, ordered rescission of all payments made by the plaintiff class to RAC, and prohibited RAC from collecting

-4-

or receiving future payments from class members under the voided agreements. RAC appealed the award of injunctive relief and this Court affirmed, conducting interlocutory review only of the injunctive relief and interdependent matters. See Fogie, 95 F.3d at 648, 654.

The District Court later modified its original order, directing the defendants to hold in escrow all payments received from rent-to-own customers during the litigation. Appointing a special master to determine the quantum of damages owed to the plaintiff class on its usury claim and to plan the damage distribution, the District Court also entered summary judgment for the defendants on the plaintiffs' non-usury claims, including their claims that THORN Americas and its parent companies had violated RICO.

The special master submitted his report and recommendations, and the District Court essentially adopted them. It entered judgment in favor of the plaintiffs in the amount of $29,898,250 plus $3418 per day from December 9, 1997, to April 15, 1998. The District Court also adopted the special master's recommended plan for depositing and distributing the damages, determined fees for the plaintiffs' attorneys, and ordered that all funds remaining unclaimed after complete distribution be placed in a *cy pres* fund. This appeal followed.

## II.

We consider first the issues raised in the plaintiffs' cross-appeal, which challenges the District Court's dismissal of the plaintiffs' RICO claims. To recover in a civil suit for a violation of RICO, a plaintiff must prove: (1) that the defendant violated 18 U.S.C. § 1962; (2) that the plaintiff suffered injury to business or property; and (3) that the plaintiff's injury was proximately caused by the defendant's RICO violation. See 18 U.S.C. § 1964(c) (1994); Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 265-68 (1992); see also United HealthCare Corp. v. American

Trade Ins. Co., 88 F.3d 563, 572 (8th Cir. 1996). The plaintiffs alleged that RAC violated subsections (a), (c), and (d) of § 1962 and that each of those violations caused the plaintiffs injuries for which they can recover under § 1964(c). The District Court for various reasons dismissed the plaintiffs' claims for alleged violations of § 1962(a), (c) and (d). We evaluate the plaintiffs' claims under each subsection separately.

## A.

The District Court ruled the plaintiffs could not recover for alleged violations of § 1962(a) because they did not have standing under § 1964(c) to bring such claims. Section 1962(a) states that

> It shall be unlawful for any person who has received any income derived . . . from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal . . . to use or invest . . . any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in . . . interstate or foreign commerce.

18 U.S.C. § 1962(a) (1994). Under §1964(c), only those injured "by reason of" a § 1962 violation have standing to bring a civil suit. See 18 U.S.C. § 1964(c); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); Appletree Square I, L.P. v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994). The District Court determined that RAC's usury constituted the collection of unlawful debts and that the plaintiffs were individuals injured by that unlawful debt collection. But the District Court concluded that only individuals injured by a completed violation of § 1962(a), those injured by the use or investment of the racketeering income, have been injured "by reason of" a § 1962(a) claim as § 1964(c) requires. Therefore, since the collection of unlawful debts was not by itself a violation of § 1962(a), the District Court dismissed the plaintiffs' § 1962(a) claim for lack of standing.

Determining whether only those injured by the use or investment of racketeering income have standing to bring a civil suit for violation of § 1962(a), or whether those injured by the predicate acts of the racketeering activity also have standing, involves an issue of first impression for this Court, one that has split the other circuits. Seven of the eight circuits that have addressed the issue agree with the District Court that §§ 1962(a) and 1964(c) limit standing only to plaintiffs who have suffered injury from the use or investment of the racketeering income. See, e.g., Vemco, Inc. v. Camardella, 23 F.3d 129, 132 (6th Cir.), cert. denied, 513 U.S. 1017 (1994); Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co., 981 F.2d 429, 437 (9th Cir. 1992), cert. denied, 508 U.S. 908 (1993); Parker & Parsley Petroleum v. Dresser Indus., 972 F.2d 580, 584 & n. 4 (5th Cir. 1992); Glessner v. Kenny, 952 F.2d 702, 708-10 (3d Cir.1991); Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1229-30 (D.C. Cir.1991); Ouaknine v. MacFarlane, 897 F.2d 75, 82 (2d Cir.1990); Grider v. Texas Oil & Gas Corp., 868 F.2d 1147, 1149-51 (10th Cir.), cert. denied, 493 U.S. 820 (1989). The Fourth Circuit, however, allows plaintiffs whose injuries flow from the predicate acts as well as to those injured by the use or investment of the racketeering income to bring a §1962(a) claim. See Busby v. Crown Supply, Inc., 896 F.2d 833, 836-40 (4th Cir. 1990).

After examining the matter de novo, we believe that the majority position is correct: under RICO, only individuals who have suffered injury from the use or investment of racketeering income have standing to bring a civil suit under §§ 1962(a) and 1964(c). As has been discussed by the other circuits, two grounds support this conclusion. First, § 1964(c) allows only persons injured "by reason of" a § 1962 violation to bring a civil suit under RICO. A person injured by predicate racketeering acts, such as RAC's unlawful debt collection, is not injured "by reason of" a violation of § 1962(a). Rather, that person is injured by conduct constituting only a predicate act. Cf. Bennett v. Berg, 685 F.2d 1053, 1060 (8th Cir. 1982) ("Significantly, [RICO] forbids the predicate acts of racketeering only insofar as an 'enterprise' is involved. . . . RICO is not a recidivist statute with enhanced penalties for acts of racketeering that

are elsewhere proscribed in the criminal code."), cert. denied, 464 U.S. 1008 (1983). In this case, for example, the plaintiffs were injured by RAC's collection of unlawful debt. They have recovered substantial damages for this injury under Minnesota usury law, and later in this opinion we uphold that recovery. RAC's collection of unlawful debt, however, does not constitute a violation of § 1962(a): it does not involve the use or investment of racketeering income "in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a). Therefore, the plaintiffs' injuries did not flow from a violation of § 1962 as § 1964(c) requires. Rather, RAC violated § 1962(a) only when it used or invested income from its unlawful debt collection in a manner prohibited by § 1962(a). RICO grants standing only to parties injured by the use or investment of the unlawfully obtained income, the completed § 1962(a) violation, and the plaintiffs are not such injured parties. See also Nugget Hydroelectric, 981 F.2d at 437 (criticizing Busby because, by not requiring that a plaintiff suffer injury from the use or investment of the racketeering income, the Fourth Circuit allows "an individual to recover for injuries caused by an action that does not constitute a violation of § 1962(a)").

Second, if individuals injured only by predicate acts could bring a civil action under § 1962(a), § 1962(c) would be rendered superfluous. Section 1962(c) creates liability for those persons who "conduct or participate . . . in the conduct" of a RICO enterprise. See 18 U.S.C. § 1962(c) (1994); see also Reves v. Ernst & Young, 507 U.S. 170, 178-79 (1993). If § 1962(a) were read to allow any person harmed by a predicate act to bring a civil suit under RICO, a defendant could be held liable for violating RICO when that defendant engaged in a predicate act, whether or not that defendant also conducted or participated in the conducting of a RICO enterprise. The restriction of § 1962(c) liability to those in management positions would be meaningless. Reading § 1962(a) so broadly that it renders § 1962(c) meaningless runs contrary to the interpretive canon that statutes should be read to give "each word some operative effect." Walters v. Metropolitan Educ. Enters., 519 U.S. 202, 209 (1997)

(citing United States v. Menasche, 348 U.S. 528, 538-39 (1955)).  To prevent almost unlimited civil liability plainly contrary to the statutory scheme of § 1962, standing to bring a civil suit for a violation of § 1962(a) must be limited to those plaintiffs whose injuries flow from the use or investment of the racketeering income.

The plaintiffs claim they can satisfy a use-or-investment requirement because RAC reinvested the income it obtained from the unlawful debt collection in the operation and maintenance of the rent-to-own business.  Such allegations of reinvestment do not suffice to give the plaintiffs standing under §§ 1962(a) and 1964(c).  Rather, to bring a claim under § 1962(a), a plaintiff must allege an injury from the use or investment of the racketeering income that is separate and distinct from injuries allegedly caused by the defendant's engaging in the predicate acts.  See Vemco, 23 F.3d at 132-33.  A distinct injury is required because, if reinvestment "were to suffice, the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation. . . .  Over the long term, corporations generally reinvest their profits, regardless of source."  Brittingham v. Mobil Corp., 943 F.2d 297, 305 (3d Cir.1991).  The plaintiffs have not and apparently cannot allege an injury from a use or investment distinct or separate from the predicate acts they allege.  Therefore, the District Court properly dismissed the plaintiffs' § 1962(a) claim for lack of standing.

### B.

The plaintiffs also appeal the District Court's grant of summary judgment to the defendants on the plaintiffs' § 1962(c) claim.  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce[] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c) (1994).  The person who conducts or participates in the conduct of the RICO enterprise must be distinct from the enterprise itself.  See

United HealthCare, 88 F.3d at 570.  The District Court concluded the plaintiffs failed to show the requisite distinctiveness of the persons and enterprise, so it granted the defendants summary judgment on the plaintiffs' § 1962(c) claim.

The plaintiffs assert that the persons allegedly conducting the RICO enterprise, THORN Americas and TEMINAH, are sufficiently distinct from the enterprise, RAC. The plaintiffs explain that THORN Americas conducts the usurious rental-purchase business nationwide while TEMINAH, the ultimate North American parent company, receives much of the illegal income.  By "RAC," the plaintiffs say they refer to the alleged RICO enterprise, the "conglomerate of corporate entities that conduct the corporate affairs of THORN EMI, plc." Appellee/Cross-Appellant's Br. at 45.  The plaintiffs also describe the roles of some of the other corporate entities that made up the RAC conglomerate: THORN EMI, Inc., for example, was "involved in the cash management," including paying THORN Americas' bills and transferring the usurious profits to other related entities; and THORN EMI, plc headed the international corporate structure.  See id.

A corporation such as THORN Americas or TEMINAH may serve as a "person" for purposes of RICO § 1962(c).  See 18 U.S.C. § 1961(3) (1994) (defining "person" as including "any individual or entity capable of holding a legal or beneficial interest in property"); see also Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 995 (8th Cir. 1989) (involving a RICO enterprise allegedly conducted by two corporate persons).  An association of business entities such as RAC also may serve as an "enterprise." See United HealthCare, 88 F.3d at 570; Atlas Pile Driving, 886 F.2d at 995 n.7.  In this case, however, the plaintiffs allege that the RICO enterprise consists solely of wholly owned, related business entities, and that some of the wholly owned subsidiaries conducted the racketeering activities for the enterprise.

This Court has not previously considered whether the § 1962(c) distinctiveness requirement may be satisfied when wholly owned subsidiaries are the persons who

conduct a RICO enterprise consisting only of the parent company and other related business entities that comprise the defendants' corporate family. When we look to the other circuits, we find little direct guidance, but we do find substantial indications that to impose liability on a subsidiary for conducting an enterprise comprised solely of the parent of the subsidiary and related businesses would be to misread the statute. Ten other circuits require that the person and enterprise be distinct.[3] Most of these circuits have suggested some limits on when related business entities, or business entities and their employees, may serve as both the person and enterprise under § 1962(c). See, e.g., Bachman v. Bear, Stearns & Co., No. 98-2396, 1999 WL 335343, at *2 (7th Cir. May 26, 1999);[4] Brannon v. Boatmen's First National Bank, 153 F.3d 1144, 1146-47 (10th Cir. 1998);Compagnie de Reassurance D'Ile De France v. New England Reinsurance Corp., 57 F.3d 56, 92 (1st Cir. 1995); Davis v. Mutual Life Ins. Co., 6

_____

[3]The sole exception is the Eleventh Circuit, which does not require distinctiveness between the person and enterprise. See Cox v. Administrator United States Steel & Carnegie, 17 F.3d 1386, 1398 (11th Cir. 1994), cert. denied, 513 U.S. 1110 (1995).

[4]The plaintiffs claim the Seventh Circuit has determined that allegations that subsidiaries conducted a parent-company enterprise are sufficient. The plaintiffs base their argument on Haroco, Inc. v. American National Bank & Trust Co., 747 F.2d 384 (7th Cir. 1984),aff'd on other grounds, 473 U.S. 606 (1985), in which the Seventh Circuit asserted that it is "virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation." 747 F.2d at 402-03. More recently, however, the Seventh Circuit has indicated that related business entities may not serve as both the person and enterprise. In Bachman v. Bear, Stearns & Co., No. 98-2396, 1999 WL 335343 (7th Cir. May 26, 1999), the court appears to reject the conclusion it suggested in Haroco. Stating that it deliberately omitted four corporations when it described the alleged RICO enterprise, the Court explains, "A firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." Id. at *2; see also Fitzgerald v. Chrysler Corp., 116 F.3d 225, 226-27 (7th Cir. 1997) (affirming dismissal on distinctiveness grounds of a complaint that alleged Chrysler Corporation was the person conducting an enterprise comprised of the "Chrysler family").

F.3d 367, 377 (6th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1193 (1995); <u>NCNB Nat'l Bank v. Tiller</u>, 814 F.2d 931, 936 (4th Cir. 1987), <u>overruled on other grounds by</u> <u>Busby</u>, 896 F.2d at 841-42; <u>Atkinson v. Anadarko Bank & Trust Co.</u>, 808 F.2d 438, 440-41 (5th Cir.) (per curiam), <u>cert. denied</u>, 483 U.S. 1032 (1987). Much of the controversy among these circuits concerns whether officers or employees of an entity may conduct an enterprise consisting of the employing entity. <u>Compare</u>, <u>e.g.</u>, <u>Jaguar Cars, Inc. v. Royal Oaks Motor Co.</u>, 46 F.3d 258, 268-69 (3d Cir. 1995) (stating the distinctiveness requirement is satisfied with allegations of "conduct by officers or employees who operate or manage a corporate enterprise"); <u>Sever v. Alaska Pulp Corp.</u>, 978 F.2d 1529, 1534 (9th Cir. 1992) (determining that employees may conduct their employer as a RICO enterprise), <u>with</u> <u>Riverwoods Chappaqua Corp. v. Marine Midlands Bank</u>, 30 F.3d 339, 344-45 (2d Cir. 1994) (stating that a group allegedly consisting of a corporation and two of its employees could not "conduct" the corporation itself as the RICO enterprise). The plaintiffs have not claimed that any employees or officers of RAC were the persons conducting the RICO enterprise, however, so we need not address this issue.

But we must consider whether a subsidiary may be sufficiently distinct from its parent or other related subsidiaries so as to satisfy § 1962(c)'s distinctiveness requirement. We believe it cannot. A parent company and a subsidiary are separate legal entities, but this is not enough. Nor is it enough that the parent and subsidiary corporations have different roles in the alleged enterprise, as would be typical of every parent-subsidiary relationship. Rather, there must be a greater showing that the parent and subsidiary are distinct than the mere fact that they are separate legal entities. To conclude otherwise would be to read the distinctiveness requirement out of RICO.

Turning our attention to the present case, the plaintiffs have not shown sufficient distinctiveness between THORN Americas; TEMINAH; THORN EMI, plc; or any of the other related business entities that allegedly comprise the RAC enterprise. All these entities are part of one corporate family operating under common control. Therefore,

we affirm the District Court's granting of summary judgment to the defendants on the plaintiffs' § 1962(c) claim.

C.

The plaintiffs' final RICO argument is that the District Court incorrectly granted the defendants summary judgment on a claim that THORN EMI, plc; THORN Americas; and TEMINAH violated § 1962(d) by conspiring to violate RICO. Subsection (d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]." 18 U.S.C. § 1962(d) (1994). The District Court concluded the plaintiffs' § 1962(d) claim necessarily failed because the plaintiffs lacked standing to bring a § 1962(a) claim and their § 1962(c) claim failed as a matter of law.

We affirm the District Court's grant of summary judgment on a different basis. Cf. Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1116 (8th Cir. 1999) ("[W]e may affirm the district court's judgment on any basis supported by the record."). The plaintiffs allege that the only participants in this conspiracy were THORN EMI, plc and its wholly owned subsidiaries THORN Americas and TEMINAH. See Third Amended Complaint at 18. Such allegations fail to allege a conspiracy, because as a matter of law a parent corporation and its wholly owned subsidiaries are legally incapable of forming a conspiracy with one another. We believe that Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), in which the Supreme Court held that a parent and its wholly owned subsidiary lacked the capacity to conspire to violate § 1 of the Sherman Act, requires the identical conclusion when the same principle is applied to alleged parent-subsidiary RICO civil conspiracies.

In Copperweld, the Supreme Court stated that "[i]n any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit." Copperweld, 467 U.S. at 769 (emphasis added). The

-13-

Court determined that an alleged conspiracy between a parent and a subsidiary lacks this crucial element:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.

Id. at 771. The Court also noted that the whole notion of an "agreement" between a parent and a wholly owned subsidiary "lacks meaning." Id.

In our analysis of the plaintiffs' § 1962(c) claim, we have already discussed the plaintiffs' failure to show any distinctiveness or independence between THORN EMI, plc and its subsidiaries THORN Americas and TEMINAH. This lack of distinctiveness or independence reinforces the conclusion derived from Copperweld that THORN EMI, plc and its subsidiaries "are common, not disparate," and that their actions are driven by a single consciousness. Cf. id. Therefore, we conclude that THORN EMI, plc; THORN Americas; and TEMINAH as wholly related business entities are incapable of conspiring with one another to violate § 1962(c).[5]

We recognize that the Seventh and Ninth Circuits have reached a conclusion different from ours. In Ashland Oil, Inc. v. Arnett, 875 F.2d 1271 (7th Cir. 1989), the Seventh Circuit determined that Copperweld does not prevent a RICO conspiracy from consisting solely of a parent and its wholly owned subsidiary because, according to the

---

[5]We do not consider the situation in which a corporation and its officers or employees allegedly formed a conspiracy. Cf. United States v. American Grain & Related Indus., 763 F.2d 312, 320 (8th Cir. 1985) (concluding that a corporation may be convicted of criminal conspiracy where corporate agents conspired with each other on behalf of the corporation).

-14-

Seventh Circuit, special policy considerations embodied in the Sherman Act do not apply in RICO cases. See id. at 1281 (discussing the theoretical "community of interest" that causes a parent and subsidiary to pose "no threat to the goals of antitrust law--protecting competition"). The Seventh Circuit stated that liability should extend to intracorporate RICO conspiracies because "intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits." Id. In Webster v. Omnitrition International, Inc., 79 F.3d 776, 787 (9th Cir.), cert. denied, 519 U.S. 865 (1996), the Ninth Circuit relied upon the Seventh Circuit's reasoning to extend § 1962(d) liability to a wholly intracorporate conspiracy.[6]

We find this reasoning unconvincing. Neither the Seventh nor the Ninth Circuit explains why, when two entities are under common control and there is no distinctiveness or independence of action, an agreement or understanding between them creates any of the special dangers § 1962(d) targets. In the absence of such an explanation, we read the plaintiffs' allegations as essentially asserting that THORN EMI, plc conspired with its arms and hands. Such allegations are not sufficient. See United States v. Computer Sciences Corp., 689 F.2d 1181, 1190 (4th Cir.1982) ("[W]e would not take seriously . . . an assertion that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon."), cert. denied, 459 U.S. 1105 (1983).

Therefore, although we do not reach the ground upon which the District Court relied, we affirm the District Court's grant of summary judgment to the defendants on the plaintiffs' § 1962(d) claim.

---

[6]We note that the Seventh Circuit's recent decisions regarding intracorporate liability under § 1962(c), see supra note 4, appear to undercut the conclusions it reached in Ashland Oil.

III.

Now we turn to the arguments raised in RAC's direct appeal regarding the damages awarded to the plaintiff class on its state-law usury claim. RAC challenges two aspects of the District Court's award of damages to individual plaintiffs. In order to give these challenges a context, we briefly summarize the District Court's damage distribution plan. The distribution plan divides plaintiffs into three groups. The first group includes two subgroups: those plaintiffs who leased goods that RAC did not designate for return and those who had previously returned their leased goods to RAC. Under the District Court's distribution plan, plaintiffs in both subgroups recover all principal and interest paid. The second group of plaintiffs consists of those plaintiffs who, when RAC designated their goods for return, elected to retain the goods. These plaintiffs receive a refund only of the interest they paid under the rent-to-own agreements. The third group also leased goods that RAC designated for return, but, unlike the second group, the third group elected to return those goods. The District Court's order grants this group, like the first group, repayment of all principal and interest paid. See Fogie v. THORN Americas, Inc., Civ. No. 3-94-359, slip op. at 7-8 (D. Minn. Apr. 15, 1998) (Order for Judgment; Orders in Enforcement of Injunction, Allowing Attorneys' Fees and Costs, and Plan of Distribution) [hereinafter "Order for Judgment"].

The first aspect of the damage distribution plan that RAC challenges is that it allows some plaintiffs--apparently members of the first and second groups--to keep the goods they had leased without paying RAC the full value of those goods. According to RAC, plaintiff class members failed to pay the department-store price for the goods leased (i.e., the fair value of the goods as determined by an unrelated retail seller) in approximately 37,500 of the 58,000 rent-to-own agreements covered by the class certification. The distribution plan allows plaintiffs who entered those 37,500 agreements to keep the goods, even those goods RAC designated for return, without making further payments. RAC claims this awards such plaintiffs an improper windfall.

-16-

Citing Burney v. THORN Americas, Inc., 944 F. Supp. 762 (E.D. Wis. 1996), RAC urges this Court to redefine the plaintiff class to exclude such plaintiffs, whom RAC calls "windfall plaintiffs."

Reviewing this legal issue de novo, we find that the District Court's order is consistent with Minnesota usury law, which permits a victim of usury to retain goods purchased through a usurious contract without paying full value for them. Since 1877, the Minnesota usury statute has provided two remedies for victims of usury: recovery of all interest paid pursuant to Minnesota Statutes § 334.02; and a declaration that the usurious contract is canceled as void pursuant to §§ 334.03 and 334.05. See Barton v. Moore, 558 N.W.2d 746, 750-51 (Minn. 1997). Minnesota courts have long stated that, when a victim of usury cancels a usurious contract, the victim does not need to compensate the usurer for the goods obtained under the usurious contract as a condition for receiving cancellation. In Trauernicht v. Kingston, 195 N.W. 278 (Minn. 1923), the Minnesota Supreme Court stated, "The general rule over the country is that a borrower on usury when he comes to a court of equity asking affirmative relief by way of the cancellation of an obligation . . . must restore the money actually received. . . . Our own rule, often announced, is that restoration need not be made." Id. at 279. The Minnesota Supreme Court determined that the Minnesota General Usury Statute requires this result. See id.

Trauernicht's interpretation of the Minnesota usury statute remains valid. See First Fed. Sav. & Loan Ass'n v. Guildner, 295 N.W.2d 501, 503 (Minn. 1980) (citing Trauernicht for the principle that a "plaintiff suing for cancellation of [a] usurious loan need not return the money actually received"); see also In re Estate of Fauskee, 497 N.W.2d 324, 328 (Minn. Ct. App. 1993) ("If a loan is usurious, it is unenforceable and the lender must forfeit interest and principal payments."). Under Minnesota law, therefore, if a seller commits usury when selling goods, the buyer may keep the goods purchased without paying the seller the full value of the goods. The buyer also may cancel the contract pursuant to §§ 334.03 and 334.05 and demand that

-17-

the usurious seller repay all interest collected as required by § 334.02. The District Court's distribution plan grants the so-called windfall plaintiffs nothing more than that specified by Minnesota law. This Court has no reason to redefine the plaintiff class as RAC requests.

The second aspect of the District Court's damage distribution that RAC challenges is the provisions that force RAC to repay principal and interest to plaintiffs in the first and third groups. Relying on Rathbun v. W. T. Grant Co., 219 N.W.2d 641 (Minn. 1974), and its progeny, RAC argues that Minnesota law allows victims of usury to recover interest only. In Rathbun, a class-action lawsuit involving usurious retail sales installment contracts, the Minnesota Supreme Court determined "that the recovery of both interest and principal provide[d] a remedy too harsh under the circumstances." 219 N.W.2d at 653. Therefore, the Minnesota Supreme Court permitted the plaintiffs to recover interest only. See id. RAC claims that Rathbun provides a bright-line rule for Minnesota usury lawsuits, or at the least for usury class-action lawsuits similar to Rathbun and the present case, that limits a usury victim's recovery to interest only. We disagree.

As we have already discussed, the Minnesota General Usury Statute grants usury victims two remedies: return of all interest paid and cancellation of the contract as void. See Barton, 558 N.W.2d at 750. When a usurious loan is canceled, "the one guilty of usurious exaction must bear the legal consequences flowing from such violation. As such he must lose not only the interest on the money risked, but also the principal, including as well all security given to secure performance." Midland Loan Fin. Co. v. Lorentz, 296 N.W. 911, 915 (Minn. 1941); accord United Realty Trust v. Property Dev. & Research Co., 269 N.W.2d 737, 743 n.12 (Minn. 1978); Fauskee, 497 N.W.2d at 328. The distribution plan, therefore, correctly enforces Minnesota law when it compels RAC to forfeit and repay all principal and interest collected on the usurious loans.

Rathbun and its progeny do not create a bright-line rule to the contrary. Rather, Rathbun and its progeny indicate that in some circumstances the forfeiture of both principal and interest may punish the usurer too harshly. See Rathbun, 219 N.W.2d at 653 (stating "that the recovery of both interest and principal provides a remedy too harsh under the circumstances" (emphasis added)); Katz & Lange, Ltd. v. Beugen, 356 N.W.2d 733, 735 (Minn. Ct. App. 1984) ("Although the interest rate . . . was usurious, [the] counterclaim seeking to have the entire underlying debt declared void is too harsh under the circumstances. Forfeiture of all the charges is a sufficient remedy." (emphasis added) (citation omitted)); Kudzia v. Wiese, No. C7-93-1906, 1994 WL 233599 (Minn. Ct. App. May 31, 1994) (unpublished) (citing Rathbun and Beugen for the proposition that "[u]nder some circumstances . . . forfeiture of the interest alone is the proper remedy for usury because forfeiture of both the principal and interest would be too harsh a remedy" (emphasis added)).

This case does not involve circumstances in which the forfeiture of principal and interest constitutes too harsh a remedy. The Order for Judgment permits a plaintiff to recover both principal and interest only when RAC failed to designate the plaintiff's goods for return or when the plaintiff returned goods RAC designated for return. In these instances, the Order for Judgment essentially rescinds the original contract: RAC has to repay both principal and interest only when it either recovers the leased goods or declines to recover those goods, apparently because the goods have little residual value. Rescission is a common remedy that does not seem too harsh, nor does RAC argue that it is. Furthermore, Rathbun and its progeny do not involve rescission cases. Concluding the distribution plan's awarding of principal and interest to plaintiffs in the first and third groups is permitted by Minnesota law and not too harsh considering the circumstances of this case, we affirm the District Court on this matter.

IV.

-19-

RAC also claims that the District Court erred when it granted the plaintiff class a retrospective remedy based on Miller v. Colortyme, Inc., 518 N.W.2d 544 (Minn. 1994). In Minnesota, "[t]he general rule is that . . . [a] decision is to be given retroactive effect." Hoff v. Kempton, 317 N.W.2d 361, 363 (Minn. 1982). But Minnesota courts recognize that sometimes retroactive application of a judicial decision is inappropriate. To determine when a legal principle should be applied prospectively only, Minnesota courts employ a three-factor standard the United States Supreme Court described in Chevron Oil Co. v. Huson, 404 U.S. 97 (1971). The three factors to consider are: (1) whether the decision overrules clear precedent or resolves an issue of first impression in a manner "not clearly foreshadowed"; (2) whether, considering the history, purpose, and effect of the legal principal at issue, retroactive application will retard, not further, that principle; and (3) whether the inequities that would result from retroactive application provide an ample basis for applying the legal rule prospectively only. See Hoff, 317 N.W.2d at 363 (quoting Chevron Oil, 404 U.S. at 106-07); see also Holmberg v. Holmberg, 588 N.W.2d 720, 726 (Minn. 1999).

This Court already considered the Chevron Oil factors and determined that retroactive application of the Miller v. Colortyme decision is appropriate. See Fogie, 95 F.3d at 651. RAC argues that our decision in Fogie does not foreclose its argument that a retrospective remedy is inappropriate because the United States Supreme Court distinguishes between retroactive application of a rule and the awarding of a retrospective remedy based upon the rule, and recognizes that sometimes retroactive-application and retrospective-remediation issues should be considered independently. See Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 754-59 (1995) (summarizing four instances when the Supreme Court observed this application-remediation distinction). Without examining the Reynoldsville Casket decision further, RAC argues this case is one in which this Court should consider the retrospective-remediation issue separately. RAC believes that, should we engage in independent retroactivity analysis of the remediation issue and use the Chevron Oil factors as directed by Hoff, we will conclude that the District Court erred in granting a retrospective remedy. RAC makes

such claims even though the Minnesota Supreme Court declined to apply the Miller v. Colortyme decision prospectively only. See Miller v. Colortyme, No. C2-92-2595, slip op. at 1 (Minn. Aug. 2, 1994) (Order denying petition for clarification).

In raising its retrospective-remediation argument, RAC bids us to make three substantial analytical leaps. First, there is no precedent indicating that Minnesota courts would make the application-remediation distinction the Supreme Court recognized in Reynoldsville Casket. Second, the United States Supreme Court, while recognizing the application-remediation distinction, has largely superseded Chevron Oil with a test under which we would be compelled to apply Miller v. Colortyme retroactively.[7] Thus, while encouraging us to employ a distinction not previously recognized by any Minnesota court, RAC urges us to use a Minnesota standard that would not be used in federal courts, the courts that have recognized the distinction. Third, RAC has not attempted to prove that, even if Minnesota courts would distinguish between retroactive application and retrospective remedy, the present case is one in which retroactive application and retrospective remedy should be

_____

[7]While Reynoldsville Casket states that sometimes retrospective remediation should be considered independently from retroactive application and provides instances of when such independent consideration was appropriate, the Supreme Court in Reynoldsville Casket does not provide a test a court should use when evaluating whether a retrospective remedy is appropriate. The Supreme Court, however, largely superseded Chevron Oil when, in Harper v. Virginia Department of Taxation, 509 U.S. 86, 96-97 (1993), it enunciated a new standard for assessing when a legal principle should be applied retroactively. Under this new standard, "[w]hen [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events." Id. at 97 If this Court applied the Harper standard to the present case, the Minnesota Supreme Court's decision to apply Miller v. Colortyme to the parties before it would seem to compel us also to apply Miller v. Colortyme retroactively in this case.

considered separately. Nevertheless, RAC urges us to engage in a separate remediation analysis.

We do not explore these three analytical leaps, however, because even if we resolved each one in RAC's favor we would still conclude that the District Court did not err when it awarded a retrospective remedy. Applying the three-factor Chevron Oil standard to consider the propriety of awarding a retrospective remedy, we would first recognize that Miller v. Colortyme did not overturn a prior decision nor did it announce a legal principle not clearly foreshadowed in Minnesota law. Rather, Miller v. Colortyme "simply stated a reasonable and correct interpretation of the law which differs from the erroneous view RAC had chosen to follow." Fogie, 95 F.3d at 651. According to the Minnesota Supreme Court in Miller v. Colortyme, this interpretation flows from the only conceivable reason the Minnesota legislature amended the CCSA in 1981--because it wanted the CCSA to cover rent-to-own agreements. See Miller v. Colortyme, 518 N.W.2d at 548.

Second, awarding a retrospective remedy would further, not retard, the principles of the Minnesota usury statute as reflected in its purpose, history, and effect. The Minnesota General Usury Statute seeks "to protect the weak and necessitous from being taken advantage of by lenders who can unilaterally establish the terms of the loan transaction." Trapp v. Hancuh, 530 N.W.2d 879, 884 (Minn. Ct. App. 1995). RAC charged interest on the rent-to-own agreements ranging from 46 to 746 percent, see Fogie, 95 F.3d at 652, approximately six to ninety-three times greater than the eight percent permitted under Minnesota law. See Minn. Stat. § 334.01 (1998). The award of a retrospective remedy for such conduct, while perhaps harsh, would further the statutory purpose of discouraging business entities from charging excessive interest rates on loans to consumers. Moreover, this remedy comports with the history and traditional effects of the Minnesota usury statute, under which courts have held that a victim may recover the principal and interest paid and security given without even paying the usurer the principal borrowed. See supra Part III.

-22-

Third, we reject RAC's arguments that the inequities that would result from awarding a retrospective remedy provide a compelling basis for us to grant only prospective relief. RAC complains that a retrospective remedy will unjustly compensate plaintiffs because it will allow them to escape paying for RAC's overhead expenses and for use of and damage to the leased goods. RAC ignores that it charged interest rates far in excess of the legal limits. RAC also ignores that the Order for Judgment allows RAC to keep some income from its usurious transactions: profits included in the retail price of designated goods the second group of plaintiffs had paid for and chose to keep and income RAC made using or investing the plaintiffs' payments of principal and interest before the plaintiffs filed suit. The equities of this case do not provide a sufficient basis for us to conclude that only prospective relief is appropriate.

None of the three Chevron Oil factors weighs in favor of denying the plaintiffs a retrospective remedy. Furthermore, as we have already stated, the Minnesota Supreme Court has refused to amend Miller v. Colortyme to make it apply only prospectively. See Miller v. Colortyme, No. C2-92-2595, slip op. at 1 (Minn. Aug. 2, 1994) (Order denying petition for clarification). Reassured by the Minnesota Supreme Court's refusal to amend Miller v. Colortyme that our determination correctly interprets Minnesota law, we affirm the District Court's grant of a retrospective remedy.

-23-

V.

RAC also challenges the *cy pres* fund that the judgment of the District Court creates for unclaimed damages. According to the Order for Judgment, if any monies remain "[a]fter the Unlocated Members Subfund is closed . . . , the pay over of waived principal refunds to [THORN] is completed . . . , all disputes are resolved . . . [,] all checks issued on the Common Fund have either expired or been cashed," and certain other taxes, fees, and expenses are paid, they are to be placed in a *cy pres* fund. Order for Judgment at 12. The District Court directs class counsel at that time to provide an accounting to the District Court and "petition the [District] Court for direction on distribution of the *Cy Pres* Fund." Id. at 13.

RAC claims that the creation of a *cy pres* fund is unprecedented and inappropriate when, as in this case, the District Court formulates an individualized remedy tied to specific transactions, and all class members are known and will receive full compensation if they come forward. RAC argues that undistributed funds should be returned so that RAC can compensate class members who seek payment after the common fund is closed but still within the time for enforcing a judgment set forth by Minnesota law.

Several questions regarding the *cy pres* fund remain unanswered. Most importantly, we do not yet know whether any undistributed monies will remain. For all that appears, at the end of the day there may be nothing left to go into the fund. Moreover, the District Court has not decided how any such funds will be distributed or to whom. In the absence of information regarding the existence and amount of residual funds, the District Court acted prematurely in ordering the creation of a *cy pres* fund. Accordingly, we vacate the portion of the District Court's order that creates the *cy pres* fund for unclaimed monies without prejudicing the District Court's ability to consider the creation of a *cy pres* fund if in fact there are unclaimed monies left after the plan for the payout of damages has been fully carried out. Cf. Hennenfent v. Mid

Dakota Clinic, P.C., 164 F.3d 419, 420 (8th Cir. 1998) (vacating without prejudice a district court's determination that an ADA plaintiff could not perform an essential function of his job because the plaintiff might still elect to undergo the medical testing necessary to make that determination).

VI.

Finally, RAC argues the District Court mistakenly granted the plaintiffs double recovery when it ordered RAC to return funds from an escrow account to the plaintiffs. RAC claims that the $1.6 million in escrow funds were already included when the parties stipulated that RAC had received $27.9 million from the plaintiff class in transactions governed by the rent-to-own agreements. The District Court found to the contrary, ordering RAC to return the $1.6 million in escrow funds and to pay damages based on the $27.9 million in receipts. We review this factual determination for clear error. See Chicago Title Ins. Co. v. FDIC, 172 F.3d 601, 604 (8th Cir. 1999).

To determine whether the escrow funds were included in the damage stipulation, we trace the history of the two amounts. Initially, the District Court did not establish an escrow account; rather, it ordered RAC to "cease making any further collections or receiving any further payments of any kind from the Plaintiff Class on the rental purchase agreements." Fogie v. Rent-A-Center, Inc., No. 3-94-359, slip op. at 16 (D. Minn. Sept. 28, 1995) (Memorandum Opinion and Order). RAC later requested that the District Court stay this requirement, claiming that, because the District Court's order prevented RAC from contacting the class members, RAC's return of payments without explanation would create unnecessary confusion. The District Court agreed with RAC that returning payments would create unnecessary confusion but declined to grant a stay. Instead, the court ordered RAC to place all payments received in a "separate, interest bearing account" until the plaintiffs were notified regarding the outcome of this litigation. See Fogie v. THORN Americas, Inc., No. 3-94-359, slip op. at 7 (D. Minn. Feb. 19, 1997) (Memorandum Opinion and Order).

-25-

The parties subsequently stipulated that the total amount of sales subject to rescission--that is, the amount "reflect[ing] receipts on rental purchase contracts issued by [THORN] from August 1, 1990, through November 13, 1996"--totaled approximately $27.9 million.  <u>See</u> Order for Judgment at 2.  The District Court used this amount to calculate interest, made other adjustments, and ordered RAC to pay approximately $29.9 million in damages.  The District Court also ordered RAC to return the $1.6 million in payments that had been placed in escrow.

After reviewing the District Court's orders regarding the treatment of payments received after litigation commenced, the creation of the escrow account, and the Order for Judgment, we do not believe the District Court clearly erred when it determined that the escrow funds were not included in the total damage stipulation.  The damage stipulation provided the total amount of RAC's actual receipts.  Because the funds placed in escrow were never received by RAC, the District Court did not clearly err when it determined the escrow funds were not included in the damage stipulation. Therefore, we uphold the District Court's decision to calculate damages based on the $27.9 million stipulation and also order RAC to return the $1.6 million in escrow funds.

VII.

For the reasons stated above, the judgment of the District Court is vacated without prejudice insofar as it creates a *cy pres* fund.  In all other respects, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-26-